[No. A041024. First Dist., Div. Two. Mar. 22, 1990.]

BILJAC ASSOCIATES, Plaintiff and Appellant, v.
FIRST INTERSTATE BANK OF OREGON, N.A., et al.,
Defendants and Respondents.

[No. A041783. First Dist., Div. Two. Mar. 22, 1990.]

ERWIN C. NIELSEN et al., Plaintiffs and Appellants, v.
FIRST INTERSTATE BANK OF OREGON, N.A., et al.,
Defendants and Respondents.

[Opinion certified for partial publication.*]

---

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication except for parts I and V.

## Counsel

Scarpulla & Scarpulla, Francis O. Scarpulla, Spiegel, Cutter, Liao & Kagay, Spiegel, Liao & Kagay, Michael I. Spiegel, Charles M. Kagay, Saveri & Saveri, Guido Saveri and Richard Saveri for Plaintiffs and Appellants.

O'Melveny & Myers, Richard E. Sherwood, Bertrand M. Cooper, Charles C. Lifland, Boyden, Cooluris, Hauser & Saxe, Dennis M. Hauser, Brian J. Evans, George M. Duff III, Kelley, Drye & Warren, Charles H. Marinaccio, Harry J. Kelly, Shigeru Watanabe, Bruce L. Ishimatsu, Howard, Rice, Nemerovski, Canady, Robertson & Falk, A. James Robertson II, Peter J. Busch, Drinker, Biddle & Reath, Raymond K. Denworth, Lawrence A. Nathanson, John J. Gill III and Michael F. Crotty for Defendants and Respondents.

## Opinion

**SMITH, J.**—In consolidated appeals, we review summary judgment granted in favor of defendant banks and bank trade associations in actions brought by commercial borrowers, under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq. [all further section references in this opinion are to that code unless otherwise specified]) and unfair competition laws (§ 17200 et seq.), for conspiracy to set and manipulate variable interest rates on loans made to "middle market" commercial borrowers.

We will affirm.

BACKGROUND

Plaintiffs in these actions are BILJAC Associates, a California partnership involved in real estate investments, and Erwin C. Nielsen and Bonnie Nielsen, a married couple operating a cattle ranch. Each allegedly took out commercial loans from one or more of the various defendant banks named below and paid prime-rate-based interest on those loans. BILJAC Associates filed its first complaint in May 1984 (No. 824289), and the Nielsens filed theirs in September 1984 (No. 829062).

The cases were inspired by the initial success of consolidated federal district court actions in *Wilcox Development* v. *First Interstate Bank of Or.* (D.Ore. 1985) 605 F.Supp. 592 (*Wilcox I*), where a jury found in favor of plaintiffs alleging federal antitrust law violations by various banking institutions based on conspiracy to raise, fix and maintain "prime" interest rates at artificial and anticompetitive levels. Plaintiffs here relied heavily at first on the record developed in the *Wilcox* litigation. The victory in *Wilcox* was short lived, however, for the defendants were granted judgment notwithstanding the verdict (*id.*, at pp. 593-594, 597), and that ruling was upheld in April 1987 by the Ninth Circuit Court of Appeals in *Wilcox* v. *First Interstate Bank of Oregon, N.A.* (9th Cir. 1987) 815 F.2d 522 (*Wilcox II*).

Meanwhile, after four amendments to the individual complaints, the cases below were consolidated, and a consolidated amended complaint was filed in December 1985. Named as defendants were six New York- and Chicago-based banking institutions and eight based in California or Oregon. Western defendants include First Interstate Bank of Oregon, N.A. (FIOR), and its holding company, First Interstate Bancorp (Bancorp), two of the respondents here.[1] The other respondents are banking industry trade association defendants: the American Bankers Association (ABA), Association of Reserve City Bankers (ARCB) and Robert Morris Associates (RMA). The parties inform us that the New York and Chicago banks settled after the judgments under review here were granted. Summary judgment was not granted as to the California banks due to other claims pending against them.

These appeals concern summary judgments granted in favor of respondents on the first, second, third and eighth causes of action of the consoli-

---

[1] The New York and Chicago defendants are Citibank, NA, Morgan Guarantee Trust Company, Bankers Trust Company, Chase Manhattan Bank, Manufacturer Hanover Trust Company and First National Bank of Chicago. California defendants besides FIOR and Bancorp are Bank of America NT&SA, First Interstate Bank of California (also a Bancorp subsidiary), Wells Fargo Bank, Crocker National Bank, Security Pacific National Bank and Union Bank.

dated amended complaint, which alleged conspiracy violations against all defendants based on the following core set of alleged facts: From the 1930's into the 1970's, the term "prime rate" was understood to be the rate which banks charged to their most creditworthy corporate commercial borrowers. It was a fairly stable rate. Then, beginning in the 1970's, major commercial banks in the United States moved from this preferred borrowing rate to the concept of a "base" or "reference" rate, one which each bank publicly announced from time to time yet continued to disseminate to the borrowing public as a "prime interest rate."

The crux of the conspiracy alleged in the first two counts as unfair competition and violating the Cartwright Act is that defendants conspired over time, through an exchange of information and ideas, to move from the traditional prime rate to the new, more volatile base rate, which the banks themselves controlled. They agreed to fix, raise, maintain and stabilize that rate, using it as a "benchmark" for commercial loans to so-called "middle-market" borrowers, and thereby suppress or eliminate competition between themselves. Forecasting the onset of worldwide inflation and rises in commercial interest rates, which might depress their profits, they conspired to raise and standardize the spread (points charged above the new base rate) for commercial borrowers, to move away from fixed-rate loans toward "floating" (variable-rate) loans referenced to the new "prime," and to base those rates on fluctuations in short-term commercial paper rates. This reduced bank competition and led to noncompetitive, high rates for middle-market borrowers while allowing banks to make below-"prime" loans to their preferred, multinational corporate borrowers and thus prevent those larger borrowers from entering the commercial paper market themselves. The conspiracy was furthered in part through meetings held under the auspices of industry trade associations.

The third cause of action alleges unfair competition in that defendants conspired to reduce borrowing alternatives by choreographing simultaneous rises in rates. Eastern banks announce upward rate changes before business hours on the east coast, transmit that information to banks in more western time zones (who announce almost identical rises) and thereby prevent borrowers from shopping for lower rates. Again, because larger borrowers borrow at below-"prime" rates, this harms only smaller commercial borrowers, for whom interest rates are maintained at "supra-competitive" levels.

The eighth cause of action charges unfair competition against the bank defendants only, alleging that they stand in a superior bargaining position to commercial borrowers, exact the disclosure of "intimate financial and personal information" in the loan application process, offer "adhesion

contracts" which leave borrowers no alternative but to accede to "unreasonable, oppressive and unconscionable" rates referenced to a controlled "prime rate," and do so without disclosing anticipated rising or falling rates during the loan term.

The bank defendants had jointly moved for summary adjudication of the antitrust and related conspiracy issues some months prior to the consolidated amended complaint being filed. Plaintiffs were granted several continuances, before and after the new pleading, to conduct further discovery. To organize the pending motion and related evidence, the court (Hon. Stuart R. Pollak) denied the motion without prejudice in February 1987, deemed the matter resubmitted, ordered that separate motions and supporting papers be filed, and set a hearing for May 7.

Judge Pollak heard the motions as scheduled, took them under submission and, in an order of June 30, 1987, granted them on the first three causes of action. Bank defendants then moved for summary judgment and/or summary adjudication of issues on various other causes of action, of which only the eighth affected FIOR and Bancorp.

At about the same time, trade association defendants moved for summary judgment on the first three causes of action, the only ones affecting them. The court (Hon. Lucy Kelly McCabe) granted the motions and entered judgment in their favor on January 11, 1988. Plaintiffs filed a timely notice of appeal the next day, and that appeal is No. A041024 in our docket.

By an order of March 14, 1988, Judge McCabe granted the bank defendants' motions for summary adjudication on the eighth cause of action and, there being no further causes of action against FIOR and Bancorp, ruled them entitled to summary judgment. Judgment in their favor was entered August 9, 1988. Plaintiffs prematurely appealed from the March 14 order (as to FIOR and Bancorp), but we construe the notice of appeal as applying to the later judgment (Cal. Rules of Court, rule 2(c)).

## DISCUSSION

### I*

. . . . . . . . . . . . . . . . . . . . .

---

\* See footnote, *ante,* page 1410.

## II

Under our summary judgment statute, supporting and opposing affidavits or declarations "shall be made . . . on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." (Code Civ. Proc., § 437c, subd. (d)). Evidentiary objections "not made either in writing or orally at the hearing" are deemed waived (Code Civ. Proc., § 437c, subd. (b)), and the court, in ruling on summary judgment, may not consider matters "to which objections have been made and sustained by the court" (Code Civ. Proc., § 437c, subd. (c)). (See also Cal. Rules of Court, rules 343 and 345, requiring page-and-line citations to objectionable matters and that specific grounds for the objections be stated.)

Plaintiffs filed voluminous evidentiary objections and a request that the court give written rulings on all objections. Judge Pollak declined, however, explaining that while he found merit to some of the objections on both sides and would be disregarding all inadmissible or incompetent evidence in ruling, he saw little purpose in rendering formal rulings.[3] Plaintiffs contend that this was reversible error. We disagree.

Nothing in the statute or rules requires a written or other formal ruling for the record, and the single case which plaintiffs cite for that proposition has no bearing on it.

Plaintiffs urge that express rulings are needed for appellate review so that they, and we, can know what evidence was considered. However, there is no use in such a procedure. We review summary judgments de novo (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203]), and the parties remain free to press their admissibility arguments on appeal, the same as they did in the trial court. Also, being able to identify particular flaws in the lower court's reasoning has no value because, as appellants themselves note, summary judgment must be upheld if correct on any ground—regardless of wrong "reasons" which may have guided the court. (*Barbary Coast Furniture Co.* v. *Sjolie*

---

[3] "[W]ith respect to . . . objections that have been made by both sides to evidentiary materials submitted by the other, I do not propose to rule individually on each exception to each piece of evidence. It would be a horrendous, incredibly time-consuming task that I think would serve very little useful purpose.

"I have noted the objections, and in part on both sides the objections are well taken. . . . I am going to disregard all those portions of the evidence that I consider to be incompetent and inadmissible." Judge Pollak restated his intentions at the close of the hearing and again in his written order.

Judge McCabe similarly did not give evidentiary rulings for the record when ruling on the eighth cause of action.

(1985) 167 Cal.App.3d 319, 331 [213 Cal.Rptr. 168].) More generally, it is presumed on appeal that a judge has not relied on irrelevant or incompetent evidence. (*Monogram Industries, Inc.* v. *Sar Industries* (1976) 64 Cal.App.3d 692, 704 [134 Cal.Rptr. 714].) No error occurred.

### III

We first examine the summary adjudication granted to FIOR and Bancorp on the first three causes of action. We do so on the assumption that plaintiffs have abandoned the third cause of action, which alleged a conspiracy to reduce competition by having eastern banks announce rate changes, disseminate that information to western banks early in the day, and in that way produce simultaneous rate increases within a single business day. This appears to be a variant of what plaintiffs call the "straw-man, parallel-pricing theory" which they abandoned below. ■ In any event, their failure to discuss the theory *on appeal* constitutes abandonment. (*Conner* v. *Dart Transportation Service* (1976) 65 Cal.App.3d 320, 323 [135 Cal.Rptr. 259]; *Jacobs* v. *Retail Clerks Union, Local 1222* (1975) 49 Cal.App.3d 959, 966 [123 Cal.Rptr. 309]; see also fn. 6, *post.*)

■ Summary judgment is a drastic measure which should be used with caution so that it does not become a substitute for trial. Affidavits of the moving party are strictly construed and those of the opponent liberally construed, with doubts as to the propriety of granting the motion resolved in favor of the opposing party. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46], cert. den. (1989) 490 U.S. 1084 [104 L.Ed.2d 670, 109 S.Ct. 2110].) ■ Summary judgment raises only questions of law, which are reviewed independently. Our review tracks the same, three-step process used by the trial court: First, we identify the issues framed by the pleadings. Second, we determine whether the moving party has established facts sufficient to negate the opponent's claim. Third, if that burden is met, we examine whether the opposing party's showing discloses that triable issues of material fact exist. (*AARTS Productions, Inc.* v. *Crocker National Bank, supra,* 179 Cal.App.3d 1061, 1064-1065.)

■ In antitrust actions brought under the Cartwright Act, we look to interpretations of its federal law counterpart, the Sherman Antitrust Act (15 U.S.C. § 1 et seq.), for guidance since the federal act was a model for our own in most respects. (*State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1153-1164 [252 Cal.Rptr. 221, 762 P.2d 385] [noting that our act is in some ways more closely modeled after Michigan and Texas acts in force when the federal act was enacted]; see generally *Mailand* v. *Burckle* (1978) 20 Cal.3d 367, 376-377 [143 Cal.Rptr. 1, 572 P.2d 1142]; *Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172

Cal.App.3d 1020, 1042 [219 Cal.Rptr. 203]; *Truta* v. *Avis Rent A Car System, Inc.* (1987) 193 Cal.App.3d 802, 822 [238 Cal.Rptr. 806].) Comparative sparsity of state-court precedent often means that we must rely heavily on federal cases. (*Redwood Theatres, Inc.* v. *Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687, 694 [248 Cal.Rptr. 189].)

*Defendants' burden*

Judge Pollak concluded initially, at the hearing, that all bank defendants had met their burdens of negating the first three causes of action *except for* FIOR and Bancorp. He deemed their showing lacking in detail and too conclusory but allowed them to file supplementary declarations and was then satisfied.

We pause to consider something which Judge Pollak noted below but which the parties do not address here, namely, that recent developments in federal summary judgment law make reliance on subsequent federal cases hazardous when deciding whether a moving party has met its burden of negating an opponent's claims. ██ Interpreting rule 56 of the Federal Rules of Civil Procedure (28 U.S.C.), the United States Supreme Court held in *Celotex Corp.* v. *Catrett* (1986) 477 U.S. 317 [91 L.Ed.2d 265, 106 S.Ct. 2548] (*Celotex*), that a moving party need not produce competent admissible evidence to negate elements of a claim on which the nonmoving party would bear the burden of proof at trial. In that situation, the moving party satisfies its burden under rule 56 "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." (*Id.*, at p. 325 [91 L.Ed.2d at p. 275]; see also *id.*, at pp. 322-325 [91 L.Ed.2d at pp. 273-275].)

That is incompatible with California law interpreting Code of Civil Procedure section 437c: "There is nothing in the statute which lessens the burden of the moving party simply because at the trial the resisting party would have the burden of proof on the issue on which the summary judgment is sought to be predicated. In such a case, on the motion for summary judgment, the moving party must generally negative the matters which the resisting party would have to prove at the trial. [Citations.]" (*Barnes* v. *Blue Haven Pools* (1969) 1 Cal.App.3d 123, 127 [81 Cal.Rptr. 444]; *Pena* v. *W. H. Douthitt Steel & Supply Co.* (1986) 179 Cal.App.3d 924, 929 [225 Cal.Rptr. 76]; *Security Pac. Nat. Bank* v. *Associated Motor Sales* (1980) 106 Cal.App.3d 171, 179 [165 Cal.Rptr. 38] [even where the moving party enjoys a presumption affecting the burden of proof].) In short, "[t]he placement of the burden of proof at trial does not affect the showing required for a summary judgment" in California. (*Lee* v. *Electric Motor Division* (1985) 169 Cal.App.3d 375, 382 [215 Cal.Rptr. 195].)

Judge Pollak expressly declined to apply *Celotex*. So do we. It represents a rule of federal civil procedure that is not binding on state courts and which conflicts with current California law.

 Returning to the briefs, plaintiffs urge that the court erroneously found defendants' burden satisfied. We disagree.

To begin with, the argument is inadequately presented. In their opening brief, plaintiffs recite boilerplate rules on hearsay, opinions, conclusions, ultimate facts, etc. They give undifferentiated citations to hundreds of objections filed below and then abruptly conclude, *without analyzing any part of the declarations,* that defendants "offered no admissible evidence . . . ." This violates the rule that an appellant must fully present all arguments in briefs rather than incorporate them by reference from papers filed below. (*Balesteri* v. *Holler* (1978) 87 Cal.App.3d 717, 720 [151 Cal.Rptr. 229].) Belatedly, in a closing brief, plaintiffs do specifically relate some of their objections to the evidence. We address only those objections that are briefed.

The first two causes of action allege unfair competition (§ 17200) and a Cartwright Act violation (§ 16720).[4] The heart of both actions is a conspiracy by banks, when lending to middle-market borrowers, to abandon the traditional prime-based, fixed-rate loans in favor of "floating" or variable-rate loans. The banks allegedly agreed to link interest rates to a new, fluctuating "prime rate" controlled by the banks themselves. The result, it is alleged, increased interest rates and reduced inter-bank competition for middle-market borrowers.[5]

Defendants' motions for summary adjudication, while directed against some of the complaint's assumed *economic* facts, focused on the crucial element of *conspiracy.* While it is not generally necessary to show a trust or conspiracy in an unfair competition claim (§ 17200) as opposed to one brought under the Cartwright Act or federal Sherman Antitrust Act, the allegations in this case clearly require a conspiracy. Plaintiffs do not allege in their unfair competition (first) cause of action that a bank which carries out the alleged interest rate practices *on its own* violates section 17200.

In fact, plaintiffs do not cite *any* unfair-competition-law authority as to these causes of action. We could deem this an abandonment of the first

---

[4] Section 16720 provides in broad terms that: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes: [¶] (a) To create or carry out restrictions in trade or commerce."

Section 17200 states in part: "As used in this chapter [ch. 5, § 17200 et seq.], unfair competition shall mean and include unlawful, unfair or fraudulent business practice . . . ."

[5] Plaintiffs defined the "middle-market" for purposes of this litigation as comprised of commercial borrowers having annual sales between several million and 250 million dollars.

cause of action. (*Conner* v. *Dart Transportation Service, supra,* 65 Cal.App.3d 320, 323; *Jacobs* v. *Retail Clerks Union, Local 1222, supra,* 49 Cal.App.3d 959, 966.)[6] Instead, however, since remedies under section 17200 are cumulative to those provided by other laws (*People* v. *McKale* (1979) 25 Cal.3d 626, 632 [159 Cal.Rptr. 811, 602 P.2d 731]; § 17205), we will take their lack of separate analysis to mean that the alleged acts are "unlawful" under that section (see fn. 4, *ante*) only to the extent that they violate the Cartwright Act (§ 16720). (See *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 329 [216 Cal.Rptr. 718, 703 P.2d 58].) Accordingly, we analyze the alleged conspiracy, as the parties do, only under cases interpreting the Cartwright Act and Sherman Antitrust Act.

■■■ Concerted activity is essential to a Cartwright Act or Sherman Antitrust Act claim because those acts prohibit only *contracts, combinations or conspiracies* in restraint of trade. (*Truta* v. *Avis Rent A Car System, Inc., supra,* 193 Cal.App.3d 802, 822; *Wilcox II, supra,* 815 F.2d 522, 525.) Summary adjudication was based on defendants having negated this element.

Defendant banks presented declarations and, after the hearing, supplementary declarations (*Johnson* v. *Banducci* (1963) 212 Cal.App.2d 254, 260 [27 Cal.Rptr. 764]) from the officers and employees charged over the years in question with setting, changing and publicizing information on their prime rates. FIOR and Bancorp relied on their own declarations as well as evidence from others.

FIOR's declarations were typical. An unbroken chain of officers whose principal responsibility it was to determine the bank's prime rate and commercial loan pricing policies from 1970 into 1986 detailed the criteria they used, the risk factors used to tailor rates for individual borrowers, the reasons for moving from fixed rates to floating rates and the reasons for changing rate criteria over the years. Each denied receiving or sharing competitive information with other banks (except for cooperative efforts such as "participation," "interbank" or "correspondent" lending), or giving notice of rate changes to others in advance of making them known to the general public. Their declarations explained how market forces influenced rates and the importance of making changes as other banks announced changes in order to compete. In addition, employees responsible for making

---

[6] Plaintiffs consistently refer to the first three causes of action as involving "antitrust" issues and only the eighth cause of action (§ 17200) as raising "non-antitrust" issues. This also shows abandonment since, as has been observed, the unfair competition law, despite its historical emphasis on protecting "competition," is more akin to a consumer-protection law than an "antitrust" law. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209-210 [197 Cal.Rptr. 783, 673 P.2d 660].)

rate changes public during those years detailed standard procedures used to do this and how the information was received from corporate higher-ups.

Renewing objections raised below, plaintiffs urge that declarations such as one from Ralph J. Voss—the chairman and chief executive officer of FIOR (known as First National Bank of Oregon until July 1981) who determined rates from 1970 to 1974—contain only opinions, legal conclusions and facts not within personal knowledge. However, discounting objectionable parts, including some that appear speculative and beyond personal knowledge (e.g., "nor, insofar as I am aware, has any other employee of FIOR . . ."), the declarations contain abundant competent and admissible evidence. Voss and other FIOR declarants, having established that they alone were responsible for determining rates and that they followed and implemented certain criteria during certain years, were competent to testify how rates and policy were set (cf. *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 167, 169 [95 Cal.Rptr. 623, 486 P.2d 151]; *Zuckerman* v. *Pacific Savings Bank* (1986) 187 Cal.App.3d 1394, 1404 [232 Cal.Rptr. 458]; *Chatman* v. *Alameda County Flood Control etc. Dist.* (1986) 183 Cal.App.3d 424, 429 [228 Cal.Rptr. 257]; *Kiernan* v. *Union Bank* (1976) 55 Cal.App.3d 111, 116 [127 Cal.Rptr. 441]) and obviously could say whether they had exchanged or agreed to exchange competitive information with other banks. They set out their objectives in attending trade association meetings and denied having agreed with other participants to take collective action or exchange confidential information on commercial rates.

Bancorp submitted declarations from its chief executive officer and its executive vice-president for finance. They show that Bancorp is a bank holding company, not a bank, and does not have a prime rate or participate in setting commercial rates of its subsidiaries (FIOR or First Interstate Bank of California).

Finally, as background and to corroborate that FIOR's conduct was consistent with independent economic activity, FIOR and Bancorp relied on declarations from several experts, including two declarations submitted by plaintiffs.

This combined evidence was enough to carry defendants' burden, under California law, of negating conspiracy. (Compare federal precedent holding conspiracy allegations rebutted by showing justifiable reasons for practices that are consistent with independent business practice, *Richards* v. *Neilsen Freight Lines* (9th Cir. 1987) 810 F.2d 898, 902; *O.S.C. Corp.* v. *Apple Computer, Inc.* (9th Cir. 1986) 792 F.2d 1464, 1468; *Barnes* v. *Arden Mayfair, Inc.* (9th Cir. 1985) 759 F.2d 676, 680.)

*Plaintiffs' burden*

Plaintiffs had to offer admissible evidence that would raise a reasonable inference of conspiracy. The California and federal high courts have urged restraint in granting defendants summary judgment " 'in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. . . .' " (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953], quoting *Poller* v. *Columbia Broadcasting* (1962) 368 U.S. 464, 473 [7 L.Ed.2d 458, 464, 82 S.Ct. 486].)

### A. *Monsanto/Matsushita*

That settled expression of deference to antitrust plaintiffs has been partly undermined in two relatively recent decisions of the United States Supreme Court interpreting the Sherman Antitrust Act. In light of the policy of antitrust law to promote procompetitive, independent business judgment and to penalize only activity which is anticompetitive and concerted, the federal high court has announced *limits* on the range of inferences that may be drawn from ambiguous evidence of conspiracy and has made it clear that those limits apply at the summary judgment stage. " '[On] summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.' . . . But antitrust law limits the range of permissible inferences from ambiguous evidence in a [Sherman Antitrust Act] § 1 case. Thus, in *Monsanto Co.* v. *Spray-Rite Service Corp.,* 465 U.S. 752 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.,* at 764. . . . To survive a motion for summary judgment . . . , a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently. 465 U.S., at 764. [Plaintiffs], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [them]. . . ." (*Matsushita Elec. Industrial Co.* v. *Zenith Radio* (1986) 475 U.S. 574, 587-588 [89 L.Ed.2d 538, 553, 106 S.Ct. 1348] (*Matsushita),* some citations omitted.) Put another way, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' [Citations.]" (*Monsanto Co.* v. *Spray-Rite*

*Service Corp.* (1984) 465 U.S. 752, 764 [79 L.Ed.2d 775, 785-786, 104 S.Ct. 1464] (*Monsanto*).)

Our state Supreme Court has not had occasion yet to endorse, in the context of the Cartwright Act, the policy limits of *Monsanto* and *Matsushita,* and the parties here differ on how and whether those limits apply in this case. An argument can be made that the limits should govern Cartwright Act cases. The same solicitude for lawful, independent business activity undergirds state law policy. ■ As this court has noted, " 'Both the Sherman Act and the Cartwright Act proscribe price fixing—*the standard for lawful competitive conduct is identical* under both state and federal law.' " (*Crown Oil Corp.* v. *Superior Court* (1986) 177 Cal.App.3d 604, 611 [223 Cal.Rptr. 164], quoting *Alton Box Bd. Co.* v. *Esprit de Corp.* (9th Cir. 1982) 682 F.2d 1267, 1274, fn. 11, italics ours.) On the other hand, as our concurring colleague notes, an argument can be made that the limits are procedural ones tied to federal summary judgment law rather than purely substantive ones flowing from antitrust law policy.

Even accepting the limits as substantive, however, leaves considerable room for argument on how they should apply in this case. Plaintiffs, for example, while not claiming that state and federal policy diverge in this context, argue that *Monsanto* and *Matsushita* apply only where *vertical* restraints of trade are involved and, therefore, cannot apply here, where the alleged restraint is *horizontal.* The argument has some appeal in that the limitation announced in *Monsanto* grew at least in part out of concern that a manufacturer in a vertical-restraint context remains free to terminate a price-cutting distributor—even in response to complaints from other distributors—so long as the decision is made independently and based on the manufacturer's legitimate marketing plans. (See analysis in *Helicopter Support Systems* v. *Hughes Helicopter* (11th Cir. 1987) 818 F.2d 1530, 1533.) On the other hand, no case called to our attention has found that distinction determinative, and we have found cases applying the *Monsanto/Matsushita* limits in horizontal contexts. (E.g., *City of Long Beach* v. *Standard Oil Co. of California* (9th Cir. 1989) 872 F.2d 1401, 1404-1407, mod. 886 F.2d 246; *Richards* v. *Nielsen Freight Lines, supra,* 810 F.2d 898, 903-904.) Most notably, the Ninth Circuit applied them in *Wilcox II,* the very litigation which spawned the cases before us now. (*Wilcox II, supra,* 815 F.2d 522, 525-526.)

Another way of interpreting *Monsanto* and *Matsushita* is one developed by the Ninth Circuit. Emphasizing that *Monsanto* only limits conspiratorial inferences to be drawn from *ambiguous* evidence, that court distinguishes between cases resting solely on *circumstantial* evidence and those in which there is at least some *direct* evidence of conspiracy, strictly applying the

limitations only in the former cases. (See, e.g., *T. W. Elec. Service* v. *Pacific Elec. Contractors* (9th Cir. 1987) 809 F.2d 626, 632; *McLaughlin* v. *Liu* (9th Cir. 1988) 849 F.2d 1205, 1207-1209; *City of Long Beach* v. *Standard Oil Co. of California, supra*, 872 F.2d 1401, 1404-1407.) In *Wilcox II,* for example, the Ninth Circuit stressed that the plaintiffs had relied solely on circumstantial evidence. (*Wilcox II, supra*, 815 F.2d 522, 525.)

We will not attempt to resolve those uncertainties in this case. It is not clear, first of all, that the court below employed the *Monsanto/Matsushita* limitation in finding that no supportable inference of conspiracy was raised. Second, we will hold that summary judgment was properly granted under standards traditionally applied in this state. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra*, 4 Cal.3d 842, 842.)

### B. *Wilcox*

*Wilcox* is the best starting point for approaching the enormous record in this case since plaintiffs incorporated much of the *Wilcox* record below. Plaintiffs do espouse a different theory. A straightforward interest-rate-fixing conspiracy was alleged in *Wilcox,* based on parallel rate movement plus other evidence. Here, plaintiffs allege a much broader conspiracy, embracing an underlying movement from fixed to floating rates, the emergence of prime rates tied to factors within the banks' control, the tendency of floating rates to move upward quickly while "lagging" in downward movement, an increased "spread" between floating rates and banks' cost of funds, banks' use of the increased spread to offset "below-prime" loans made to more powerful, "Fortune 500" companies that might otherwise be lost to other funding sources, and a resulting harm to middle-market commercial borrowers that lack similar alternatives. The effect of this shift is to abandon any claim of actual rate fixing and to claim instead, in the words of one of plaintiffs' experts, that "the major banks have now somehow managed to put together a system that provides incentives to go along with increases in the prime and incentives not to go along with the decreases, *even without communication among the banks regarding individual decisions.*" (Italics added.) This is a different theory than the one alleged in *Wilcox.*

Nevertheless, much of the same conspiratorial activity is alleged here, particularly the exchange of ideas at meetings of defendant trade associations. Thus the *Wilcox* cases remain highly relevant as background, and plaintiffs do not dispute the results reached there.

All evidence of conspiracy in the *Wilcox* cases was circumstantial (*Wilcox II, supra*, 815 F.2d 522, 525) and, in the end, was found wanting not

only under *Monsanto* and *Matsushita,* but also under Ninth Circuit authority predating those cases. *Parallel movement of prime rates was not enough by itself.* As the court found on virtually the same evidence produced here, "Reliance on other banks' prime rate changes is a convenient and accurate way for FIOR to maintain its prime rate at the level set by the national market." *(Id.,* at p. 526.) The fact that FIOR was the only Bancorp subsidiary to use a " 'count-to-four' " rule for rate changes (i.e., raising or lowering them whenever four out of seven major West Coast competitors did so) further "indicate[d] independent action." *(Ibid.)* Using other banks' rate changes is not illegal. The information is public and disseminated over wire services, and the prime rate is just one factor affecting commercial interest rates: "The prime rate is more indicative of an average cost because most loans are negotiated at interest rates either a certain percentage above or below prime. Thus disclosure of the prime rate does not enable competitors to conspire to fix prices . . . . An exchange of price information which constitutes reasonable business behavior is not an illegal agreement." *(Id.,* at pp. 526-527, citations omitted.) Here, as was true in *Wilcox II,* FIOR's cooperative exchange of interest rate information in negotiating "participation loans" is "a necessary incident" to that task. *(Id.,* at p. 527 & fn. 4.)

Finally, the Ninth Circuit found nothing collusive in what plaintiffs here offer as convincing "evidence" of illegal motive—that a two-tier system was developed whereby larger, more creditworthy borrowers were able to obtain below-prime rates while middle-market borrowers could not. Rejecting the notion that this showed a motive "to stabilize profits by avoiding competitive forces that could bring interest rates down," the court observed: "Near uniformity in prime interest rates reflects a competitive market for funds. Prime rates will arguably be nearly identical when each bank pursues its individual self-interest because failure to follow national prime rates could cause either losses or severe liquidity problems. FIOR presented credible, rebutting evidence that sub-prime loans and prime based loans are offered to different classes of borrowers and that both markets are highly competitive; that middle-market customers are not strong or secure enough to enter the sub-prime market; and that the prime based loans carry higher risks and are influenced by the national prime rate which theoretically reflects all relevant business conditions influencing the cost of funds. [¶] . . . A two-tier pricing system is not inherently non-competitive unless it can be shown to be related to an anti-competitive agreement. [Citation.] There has been no such showing here. The actions alleged to constitute a conspiracy are precisely those that could be motivated by independent self-interest." (815 F.2d at p. 528.)

Sustaining a grant of judgment notwithstanding the verdict, the court held that the plaintiffs had not "carried their burden of proving that an

inference of conspiracy was more probable than an inference of concerted action . . . ." (815 F.2d at p. 528.) The Ninth Circuit's application of *Monsanto* and *Matsushita* does not concern us here since plaintiffs in this case insist that they abandoned the pure parallel price-fixing theory of *Wilcox* in the court below and, therefore, do not challenge the Ninth Circuit's result.

### C. *New theory and the evidence*

Plaintiffs' theory is conceptually at odds with the one presented in *Wilcox*. Here, rather than conspiring to fix rates, the defendants are seen as conspiring to set in place a *system* by which they act independently, in the sense that each has and periodically adjusts its own prime rate more or less in accord with other banks' rate changes, but with the net effect being an assertedly anticompetitive control over rates. In other words, the conspiracy is not to fix prices but to fix a new system which *results* in more or less even loan pricing.

This conceptual difference brings even more difficult problems of proof than those encountered in *Wilcox*. Here, as there, no one disputes that middle-market borrowing did change over time, more or less as alleged. The ultimate question is whether it did so as a result of conspiracy or, instead, as the result of independent business judgment in response to market forces. "Section 1 of the Sherman Act is not concerned with individual conduct, no matter how anticompetitive." (*Overseas Motors, Inc.* v. *Import Motors Limited, Inc.* (E.D.Mich. 1974) 375 F.Supp. 499, 531, affd. (6th Cir. 1975) 519 F.2d 119, cert. den., 423 U.S. 987 [46 L.Ed.2d 304, 96 S.Ct. 395]; *Fisher* v. *Berkeley* (1986) 475 U.S. 260, 266 [89 L.Ed.2d 206, 106 S.Ct. 1045].)

The court in *Wilcox II* saw that market forces were *as likely as not* the reason for the complained-of parallel prices, meaning that inferences *preponderated* in favor of independent rather than concerted action. Here, the *only* logical inference is that the movement from a fixed prime to individually set "primes" was due to market forces. It is undisputed that these changes were industry-wide and evolved over almost 10 years, with different banks (conspirators in plaintiffs' view) trying and ultimately abandoning many alternatives during that time. (See discussion in text, *post.*) Even plaintiffs' experts in this case, economists who felt that some of those practices were anticompetitive, agreed that they were consistent with prevailing economic pressures and independent business judgment. (See also *Wilcox I, supra*, 605 F.Supp. 592, 595.) It is almost a contradiction in terms to say that defendants could "conspire" to achieve a uniform result and yet take 10 years (with independent, halting attempts to arrive at the right system) to accomplish that conspiracy.

Also, as in *Wilcox,* these plaintiffs offer no *direct* evidence of conspiracy. " '[D]irect evidence' means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." (Evid. Code, § 410.) The closest they come is some direct evidence that floating rates, interest rates and interest-rate pricing were topics of *discussion,* usually at trade association meetings. It requires further inferences, however, to conclude that any *agreement* or *consensus* came out of those discussions.

In general, trade association activities tend to promote competition and are lawful. Gathering and compiling industry information and disseminating it among members does not offend antitrust policy, even though to do so naturally "tends to stabilize that trade or business and to produce uniformity of price and trade practice." (*Maple Flooring Assn.* v. *United States* (1925) 268 U.S. 563, 582 [69 L.Ed. 1093, 1102, 45 S.Ct. 578].) "Competition does not become less free merely because the conduct of commercial operations becomes more intelligent through the free distribution of knowledge of all the essential factors entering into the commercial transaction." (*Id.,* at p. 583 [69 L.Ed.2d at p. 1102], fn. omitted.) Individuals engaged in trade association activities, including the exchange of information on market prices, "are not engaged in unlawful conspiracies in restraint of trade merely because the ultimate result of their efforts may be to stabilize prices or limit production through a better understanding of economic laws and a more general ability to conform to them, for the simple reason that the Sherman Law neither repeals economic laws nor prohibits the gathering and dissemination of information." (*Id.,* at p. 584 [69 L.Ed.2d at p. 1103].) Members do not "become . . . conspirators merely because they gather and disseminate information . . . bearing on the business in which they are engaged *and make use of it in the management and control of their individual businesses . . . .*" (*Ibid.,* italics added.) Only when they take *concerted action to restrain trade* based on such information do they act illegally. (*Id.,* at p. 584 [69 L.Ed.2d at p. 1103].)

Plaintiffs set the stage for their allegations with evidence that loan pricing and interest rates were the subject of trade association panel discussions, publications, meetings, symposia and the like in the 1970's, when the shift to floating rates and other developments of which they complain occurred. It is not disputed that those topics were discussed. However, such activity is condoned under antitrust policy, and thus no inference of conspiracy may be drawn from it without proof of agreement or concerted action to manipulate the commercial loan market with such information. There is also undisputed evidence that market forces, including the onset of unprecedented high inflation and interest rate instability made those topics timely and natural ones within the industry.

As proof of agreement, plaintiffs point to evidence which corroborates the fact of those discussions, but without disclosing any agreement or even, in some instances, whether any named defendants were participants. That evidence does not bear further discussion.

There is evidence that discussions of floating rates during the early 1970's turned to the question of what indices could be used as references and that some banks (not including FIOR) instituted formulas for tying their primes in varying ways to market indices, such as short-term commercial paper rates or certificate of deposit rates. However, as defendants point out, those formulas differed from one another, were often revised or suspended, and received widespread publicity in the popular and trade press. Of the three banks in this case that experimented with them, two abandoned formulas in the early 1970's while one (Citibank) did not do so until 1981. This hardly connotes a conscious commitment to a *common* scheme (*Monsanto, supra,* 465 U.S. 752, 764 [79 L.Ed.2d 775, 784]), and there was undisputed testimony that those defendants using the formulas set them independently. Since there is no reasonable basis for inferring concerted action in instituting these formula rates, there can be no merit to the argument by plaintiffs that there was concerted action in abandoning them and ultimately adopting criteria (differing from bank to bank) over which banks had more control.

To show motive and a conspiracy to raise interest rates, plaintiffs rely on some extremely vague evidence, such as a program (from ARCB's 1972 annual meeting) on which Richard Cooley, then-president of Wells Fargo Bank, wrote: "Bankers Trust—predicts prime rate 6-6½% by yr. end if floating rate allows normal upward movement. Need other b[an]ks to make idea stick." Not only is this vague on its face but Cooley explained in deposition that the note was a reminder to himself that the forecast rise depended on other banks adopting *formula rates.* As just noted, that "conspiracy" went nowhere.

Some communications which plaintiffs cite for motive and conspiracy involve discussions of risk-analysis factors. However, the record shows that those factors determine rate distinctions not only between larger borrowers and the middle market, but also between borrowers *within* the middle market. This does not show collusion any more than the "two-tier" system noted by the Ninth Circuit in *Wilcox.* (*Wilcox II, supra,* 815 F.2d 522, 528.)

Plaintiffs lay special emphasis on the activities of Richard L. Thomas. They first point to remarks that he gave, as president of First National Bank of Chicago, at a 1975 RMA panel discussion on future lending needs and priorities. Underlining every reference to "pricing" in the remarks, plaintiffs

urge that these *public* and *published* remarks set the tone for later, *private* talks on raising rates for middle-market borrowers. Defendants correctly note, however, that this distorts the message. In context, he was urging that despite a severe capital shortage on the horizon, banks should allocate more capital to growing ("deserving") small and medium sized companies while making rate distinctions between seasonal and "permanent" loans. The fact that these were only part of his remarks, and that he was just one of four speakers (others spoke for legislative, regulatory and commercial customer sectors), further attenuates the inferences urged by plaintiffs.

Thomas went on to serve as chairman of ARCB's Committee on Bank Credit Policies (CBCP) for the following fiscal year, 1976-1977. Plaintiffs cite letters from that period, most of them to and from other committee members. The letters explore "appropriate pricing policies," "differential pricing," credit trends, the future of commercial lending and like subjects, as possible topics for inclusion on the agendas for a January 1977 CBCP meeting on bank practices and an April 1977 CBCP panel discussion on "Trends in Commercial Bank Credit" (part of ARCB's annual meeting in Phoenix), both of which Thomas moderated.[7]

Plaintiffs confront serious obstacles in trying to weave a thread of conspiracy through Thomas's activities with ARCB. First is the strong policy that disseminating competitive information, even pricing information, through trade association activities is condoned by antitrust law.

---

[7] For example, a fellow committee member wrote to Thomas just a week before the January meeting: "With reference to Point #2 of your letter of January 7, and as I view sagging domestic loan demand and an anything but ebullient near-term loan forecast, I wonder if the pricing section of our agenda could be amplified to include some discussion relating to differential pricing. With so many of our higher quality relationships covering what modest short-term requirements they may have in the commercial paper market, I think that the industry needs to develop a way in which these borrowers can be brought back to the banking system, but at the same time without jeop[a]rdizing the spreads on existing credits that merit higher interest rates. It is a difficult area, but I do think our industry needs to develop a more sophisticated approach to the pricing of our credit-related products."

Another letter, from Thomas to CBCP members a month before the April meeting, reads in part: "[M]y thinking is that we can divide the panel into four sections. As moderator, I thought I might open the session by giving a brief overview of the role of commercial bank credit in our economy, perhaps dating back to the end of World War II, but with greater emphasis on the past five years. Reuben Richards has then agreed to talk for seven or eight minutes on current activities in the marketplace, and Harry Meily has then agreed to discuss the likely course of commercial bank lending in the future. Finally, Charlie Pistor will discuss the personnel implications of current practices and anticipated developments in commercial bank lending. "

At the April panel, Thomas prefaced his remarks as follows: "Our basic concern today . . . is whether or not there has been a *fundamental* change in demand for commercial loans. Frankly, we don't know for sure, but we hope that our discussion today will shed some light on the issues involved. We do believe that the answer to that question will have important implications for the way we will be doing business in the next several years."

Members may use that information in the management and control of their individual businesses. It is only where they take concerted action to restrain trade based on such information that the law is violated. (*Maple Flooring Assn.* v. *United States, supra*, 268 U.S. 563, 585 [268 U.S. 563, 1103].) Thus, plaintiffs must show conspiracy with something beyond the ARCB's activities. Second, while bits and pieces of committee members' letters might connote advocacy of a sort in the area of commercial credit policy (see fn. 7, *ante*), we must distinguish between those private communications (the letters) and the way that such information actually came out in panel discussions. The public discussions themselves, according to the record we have, lacked the degree of innuendo found in the letters. Third, the panel discussions covered a wide array of topics, only a small part of which concerned commercial loan pricing, which makes the potential for conspiracy more remote.

Plaintiffs depend on the coincidence of certain topics having been discussed and the concurrent or later development of consistent trends in the marketplace. Analogizing the case to one where several people enter a room together, hear an idea and then, the next day, all begin acting in accord with that idea, plaintiffs urge that there *must* be a conspiracy. However, the analogy proves too facile. This was not a room full of people; the conspiracy as envisioned by this lawsuit was nationwide, involving virtually every commercial bank, coast to coast. The "concert of action" was not evidenced overnight; it took years to develop. ▮▮▮ To the extent that we can attribute the evolution in middle-market lending to trade association activities, the facts are overwhelmingly consistent with the legitimate dissemination and use of information, not conspiracy in the antitrust sense. Plaintiffs' showing fails to bridge the gap.

We have examined plaintiffs' remaining evidence and find it no more probative, even in the aggregate.

We hold, as the court below did, that plaintiffs failed to raise a triable issue of fact on the issue of antitrust conspiracy. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra*, 4 Cal.3d 842, 842; *AARTS Productions, Inc.* v. *Crocker National Bank, supra*, 179 Cal.App.3d 1061, 1064-1065.) Failure to raise a triable issue of antitrust conspiracy (and the derivative unfair competition claim) (§§ 16720, 17200) means that the court properly granted summary adjudication.

## IV

▮▮▮ It follows from our analysis in part III that summary adjudication was also properly granted to the trade association defendants to the extent

that they and plaintiffs relied on the same evidentiary materials. In fact, the trade associations offered that evidence *and more* to carry their burden of negating the conspiracy claim. They submitted declarations showing that they are not banks, do not lend money, charge, have or set prime rates, do not participate in setting members' rates, and exist as banking industry organizations that foster education, legislation, and the dissemination of economic and regulatory information among their members, regulators and the public through a range of forums, including regular meetings and publications.[8]

Plaintiffs, for their part, relied on essentially the same evidence as presented against the bank defendants' motions. Our previous discussion thus suffices here as well.

Plaintiffs ask us to draw inferences in their favor based on assertions that trade association defendants destroyed documentary evidence and offered only "obfuscation" and "double talk" in depositions. They cite no authority, however, and thus waive the claim. (*Strutt* v. *Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 873 [105 Cal.Rptr. 395].) In any event, the "destroyed" evidence of which they speak includes committee meeting minutes which defendant ARCB explained, by affidavits filed below, *were never kept during the years in question* and a calendar page which, while lost during discovery, was described by an employee who had seen it. Also, a Citibank officer whose calendar for 1971 could not be produced explained in deposition what steps he had taken to locate it and that he could not find it. The "double talk" to which plaintiffs allude amounts to deponents admitting being at certain meetings (based on calendar notations) but being unable to recall details of those meetings. This was hardly surprising since the meetings were held many years past. Nothing in this "destruction" of evidence would raise inferences of conspiracy.

For reasons already stated in part III, we deem the third cause of action abandoned, view the first cause of action (unfair competition) as depending entirely on the second (Cartwright Act), and reject the idea that the court (this time Judge McCabe) had to give formal rulings on evidentiary objections. Plaintiffs again urge that inadmissible evidence was presented, but our analysis in part III coupled with plaintiffs' failure to brief particular deficiencies in any detail, makes an elaborate response unnecessary. We simply note that enough competent, admissible evidence was presented to negate the conspiracy allegations, ignoring those parts of the declarations

---

[8] Defendant ABA is a national trade association whose members include over 11,000 commercial banks. ARCB, founded in 1912, is an association of individual bankers from commercial banks. RMA is an association of 3,100 institutions comprised mostly of commercial banks but including some savings banks and savings and loan associations.

which truly were too conclusionary. In general, the declarants established that they were in positions to know from personal knowledge whether there was collusive agreement by the trade associations.

Turning to plaintiffs' responsive showing, we have already determined that insufficient evidence was presented to draw a reasonable inference of conspiracy among the *bank* defendants, and the trade association defendants presented undisputed evidence that they did not have or set interest rates. Since liability can only be predicated on fostering and encouraging a bank conspiracy for which no reasonable inference was raised, Judge McCabe properly granted summary adjudication. Because only the first three causes of action affected the trade associations, she also correctly granted them summary judgment.

V*

. . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgments are affirmed.

Benson, J., concurred.

**KLINE, P. J.,** Concurring.—In agreement with my colleagues that summary judgment was properly granted, I write separately to more fully address respondents' claim that, in the context of a motion for summary judgment, the proper standard to be applied in determining whether the evidence will support an inference of concerted action in a Cartwright Act case ought to be that prescribed by the United States Supreme Court in *Matsushita Elec. Industrial Co.* v. *Zenith Radio* (1986) 475 U.S. 574 [89 L.Ed.2d 538, 106 S.Ct. 1348] (*Matsushita*).

Relying upon *Matsushita,* respondent banks vigorously contend that "it is not enough for plaintiffs to point to evidence that is as consistent with lawful independent action as with unlawful concerted action." According to the banks, "[s]uch evidence is insufficient as a matter of law to establish an unlawful antitrust conspiracy and hence cannot give rise to a triable issue of material fact." These "*Matsushita* principles" apply to proof of price fixing conspiracies under the Cartwright Act, the banks maintain, because the California Supreme Court has repeatedly held that federal cases interpret-

*See footnote, *ante,* page 1410.

ing section 1 of the Sherman Act are persuasive in cases filed in state court under the Cartwright Act.

It is, of course, true that "[i]n interpreting the Cartwright Act, we properly look to the Sherman Act and cases construing it: 'the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law.'" (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 320 [216 Cal.Rptr. 718, 703 P.2d 58], quoting *Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833].) This familiar principle does not mean, however, that interpretations of the federal rule pertaining to summary judgment (Fed. Rules Civ. Proc., rule 56, 28 U.S.C.) controls application of the California summary judgment statute (Code Civ. Proc., § 437c) in Cartwright Act cases. *Matsushita* cannot be reconciled with the California statute and case law pertaining to summary judgment and therefore cannot be followed by the courts of this State.

## I.

*Matsushita* is among a trio of cases interpreting rule 56 of the Federal Rules of Civil Procedure, all decided in 1986 by sharply divided courts, that collectively mark a major change in the United States Supreme Court's attitude about summary judgment. (Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court* (1987) 116 F.R.D. 183.) Though *Matsushita* involves application of the Sherman Act it is primarily significant for what it has to say about the burden of proof and the burden of persuasion in connection with summary judgment motions. Because it is so inextricably a part of a new federal judicial view of summary judgment, *Matsushita* is best understood in the context of the two other summary judgment cases decided the same term: *Celotex Corp.* v. *Catrett* (1986) 477 U.S. 317 [91 L.Ed.2d 265, 106 S.Ct. 2548], and *Anderson* v. *Liberty Lobby, Inc.* (1986) 477 U.S. 242 [91 L.Ed.2d 202, 106 S.Ct. 2505].

*Celotex* was an asbestos products liability suit in which the defendant sought summary judgment on the ground that there was no evidence connecting the decedent with its asbestos and that the plaintiff had failed to identify any witness who could establish such a connection. The Court of Appeals reversed the grant of summary judgment, declaring that rule 56 imposed upon the defendant movant the "burden of coming forward with proof of the absence of any genuine issues of material fact." (*Catrett* v. *Johns Manville Sales Corp.* (D.C. Cir. 1985) 756 F.2d 181, 184 [244 App.D.C. 160], fn. omitted.) Summary judgment should have been denied, the Court of Appeals reasoned, because the defendant had offered no evidence. The Supreme Court reversed, ruling that a defendant seeking summary judgment, *who does not bear the ultimate burden of proof,* may rely

on the record to show the absence of a genuine dispute about a material fact. "In our view, the plain language of rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the ultimate burden of proof at trial." (*Celotex Corp.* v. *Catrett, supra,* 477 U.S. at p. 322 [91 L.Ed.2d at p. 273].)

*Anderson* v. *Liberty Lobby, Inc., supra,* 477 U.S. 242, decided the same day as *Celotex,* was a libel suit against the publisher and editor of a magazine. The defendants moved for summary judgment on the theory that the essential element of "actual malice" was absent as a matter of law. In support of the motion the author of the article submitted an affidavit specifying his sources, describing the extent of his considerable research and stating his belief that the article was truthful and accurate. Concluding that the district court properly granted the defendants' motion for summary judgment, the Supreme Court held that, as in the case of a motion for directed verdict, a court ruling on a motion for summary judgment "must be guided by the substantive evidentiary standards that apply to the case." (*Id.,* at p. 255 [91 L.Ed.2d at p. 216].) In determining whether a dispute is "genuine" within the meaning of rule 56, the trial judge must inquire whether a "reasonable" jury could find for the nonmoving party. A "genuine" dispute is one that is not "one-sided" and one which could reasonably be resolved by a "fair-minded" jury in favor of either party. (*Id.,* at pp. 251-252 [91 L.Ed.2d at pp. 213-214].)[1]

As will be seen, *Matsushita* is of a piece with *Celotex* and *Anderson* in that it permits a defendant seeking summary judgment in federal court to shift a greater evidentiary burden to the nonmoving plaintiff than is permitted under the California summary judgment statute.

---

[1] In his dissent in *Anderson,* Justice Brennan contended that the majority, "while instructing the trial judge to 'consider' heightened evidentiary standards, fails to explain what that means. In other words, how does a judge assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide?" (*Id.,* at p. 265 [91 L.Ed.2d at p. 222].) Because the majority opinion "could surely be understood as an invitation—if not an instruction—to trial courts to assess and weigh evidence much as a juror would" (*id.,* at p. 266 [91 L.Ed.2d at p. 223]), Justice Brennan feared it "may erode the constitutionally enshrined role of the jury." (*Id.,* at p. 268 [91 L.Ed.2d at p. 224].) Justice Rehnquist who in an opinion joined by Chief Justice Burger also dissented in *Anderson,* claimed that the "substantive standard" which the majority decided must be applied by trial courts in deciding a motion for summary judgment "is actually a procedural requirement engrafted onto Rule 56." (*Id.,* at pp. 268-269 [91 L.Ed.2d at p. 225].) "The Court's decision to engraft the standard of proof applicable to a factfinder onto the law governing the procedural motion for a summary judgment (a motion that has always been regarded as raising a question of law rather than a question of fact [citation]), will do great mischief with little corresponding benefit." (*Id.,* at p. 272 [91 L.Ed.2d at p. 227].)

*Matsushita* was a highly unusual antitrust case.[2] The plaintiffs, a group of American electronics manufacturers, claimed that the 21 defendants, Japanese television manufacturers and their affiliated trading companies, conspired to fix artificially high prices in Japan and artificially low prices in the United States. By boosting the prices of Japanese goods in Japan the defendants allegedly subsidized the artificially low priced sales of their products in the United States. By minimizing competition in the United States between Japanese manufacturers, it was claimed, the defendants facilitated predation against their American competitors.

The Supreme Court clearly believed this scenario preposterous. "[P]redatory pricing schemes are rarely tried, and even more rarely successful." (*Matsushita, supra*, 475 U.S. at p. 589 [89 L.Ed.2d at p. 554].) Moreover, a scheme involving 21 conspirators "is incalculably more difficult to execute than an analogous plan executed by a single predator." (*Id.* at p. 590 [89 L.Ed.2d at p. 554].) "Finally," the court observed, "if predatory pricing conspiracies are generally unlikely to occur, they are especially so where, as here, the prospects of attaining monopoly power seem slight. In order to recoup their losses, petitioners must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices." (*Id.*, at pp. 590-591 [89 L.Ed.2d at p. 555].) Data in the record strongly suggested that the goals of the alleged scheme had not been achieved. The two largest shares of the retail market in television sets was held by American, not Japanese manufacturers. Moreover, those shares did not decline appreciably during the two decades after the conspiracy were alleged to have commenced. (475 U.S. at p. 591 [89 L.Ed.2d at p. 555].) After further analysis the court concluded that "petitioners had no motive to enter into the alleged conspiracy. To the contrary, as presumably rational businesses, petitioners had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains." (*Id.*, at p. 595 [89 L.Ed.2d at p. 558], italics in original.)

---

[2] "*Matsushita* was the quintessential overblown antitrust case. The published opinions of the trial court 'would fill an entire volume of the *Federal Supplement.*' By the time the court granted summary judgment for defendants in 1981, the record had ballooned so that the 'essence of the evidence' filled forty volumes. Judge Becker, who ruled much of the evidence inadmissible and granted summary judgment, said the 'enormous record . . . may be the largest summary judgment record ever developed.' To manage this record he required plaintiffs to file a 'final pretrial statement' detailing every fact they hoped to prove at trial, and all evidence that would be offered to prove these facts. The final pretrial statement was to have preclusive effect: except for good cause, no other facts or evidence could be offered at trial. Plaintiffs' final pretrial statement totaled 11,500 pages, not counting a 6,000 page appendix that cross-referenced 250,000 pages of documents." (Calkins, *Summary Judgment, Motions to Dismiss, and Other Examples of Equilibrating Tendencies in the Antitrust System* (1986) 74 Geo.L.J. 1065, 1123.)

After establishing the implausibility of the plaintiffs' claim, and inquiring whether the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, the court had little trouble concluding that there was no "genuine issue for trial" within the meaning of rule 56(e).) (475 U.S. at p. 598 [89 L.Ed.2d at p. 559].) To survive a defendant's motion for summary judgment in a Sherman Act case, the court declared, a plaintiff "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." (*Id.*, at p. 588 [89 L.Ed.2d at p. 553].) This "tends to exclude" standard requires a plaintiff to produce considerably more evidence of agreement than does the reasonableness standard that was previously applied.[3] "While it does not technically require a specific determination by the judge that the existence of an agreement is more probable than not, as a practical matter it amounts to the same thing." (Shores, *Narrowing the Sherman Act Through an Extension of Colgate: The Matsushita Case* (1988) 55 Tenn.L.Rev. 261, 298-299.)

One of the most notable aspects of *Matsushita* is its adoption of the rationale of *Monsanto Co.* v. *Spray-Rite Service Corp.* (1984) 465 U.S. 752 [79 L.Ed.2d 775, 785-786, 104 S.Ct. 1464]. In a footnote, the *Matsushita* court stated that "[w]e do not imply that, if petitioners had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in *Monsanto Co.* v. *Spray-Rite Service Corp.,* . . . establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." (*Matsushita, supra*, 475 U.S. at p. 597, fn. 21 [89 L.Ed.2d at p. 559].) Unlike *Matsushita, Monsanto* was a vertical case. Before *Matsushita* it was generally understood that the evidentiary standard for inferring an agreement was much higher in the vertical context than the horizontal.[4] *Monsanto,* which reinforced the early decision in *United States*

---

[3] It is true that in the very next sentence after the one in which the court articulates the "tends to exclude" standard the court states as follows: "Respondents . . . , in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents." (475 U.S. at p. 588 [89 L.Ed.2d at p. 553].). Taken at face value, this sentence creates an ambiguity, because it is inconsistent with the preceding statement that the plaintiff must present "evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." However, other language in *Matsushita* makes it very clear that "tends to exclude" standard prevails; particularly the statement that "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." (*Id.*, at p. 597, fn. 21 [89 L.Ed.2d at p. 559].)

[4] The *Monsanto* court emphasized that distributor termination are different from horizontal cases in several ways. "For example, the fact that a manufacturer and its distributors are in constant communication about prices and market strategy does not alone show that the distributors are not making independent pricing decisions." (*Id.*, at p. 762 [79 L.Ed.2d at p. 784].) Moreover, complaints from rival distributors are natural and unavoidable and " 'do not indicate illegal concerted action.' " (*Monsanto, supra*, 465 U.S. at p. 763 [79 L.Ed.2d at p. 785], quoting *Roesch, Inc.* v. *Star Cooler Corp.* (8th Cir. 1982) 671 F.2d 1168, 1172.) Thus, it

v. *Colgate & Co.* (1919) 250 U.S. 300 [63 L.Ed. 992, 39 S.Ct. 465, 7 A.L.R. 443], was taken by the lower federal courts to mean that they should apply a "lesser standard" for plaintiffs to meet in establishing a horizontal combination than a vertical agreement. (See, e.g., *Filco* v. *Amana Refrigeration, Inc.* (9th Cir. 1983) 709 F.2d 1257, 1266.) Moreover, the *Monsanto* principles were originally fashioned for use in vertical cases *after trial on the merits,* not in connection with summary proceedings prior to trial.

By using *Monsanto* to redefine the substantive law, *Matsushita* alters the procedural rules and the evidentiary standard applicable in connection with motions for summary judgment in antitrust cases. *Matsushita* is in this respect analogous to *Anderson* v. *Liberty Lobby, supra*, 477 U.S. 242; both decisions mean that a plaintiff cannot at the summary judgment stage rely on undisputed evidence where under the applicable substantive law his right to a jury verdict would turn on a mixed question of fact and law. Whereas summary judgment was previously denied whenever competing inferences could reasonably be drawn, it is in the federal courts now proper to grant the motion in such circumstances. Moreover, once the moving defendant has shown that competing inferences may reasonably be drawn, which may not prove difficult, the nonmoving plaintiff must satisfy a much more daunting evidentiary requirement. This evidentiary requirement also vests the judge with powers that federal courts previously reserved to the jury. As Justice White pointed out in his dissent in *Matsushita,* which was joined by three of his colleagues, the majority's reference to *Monsanto* "suggests that a judge hearing a defendant's motion for summary judgment in an antitrust case should go beyond the traditional summary judgment inquiry and decide for himself whether the weight of the evidence favors the plaintiff. [The cases relied upon, *Monsanto* and *First Nat. Bank* v. *Cities Service* (1968) 391 U.S. 253 (20 L.Ed.2d 569, 88 S.Ct. 1575)], do not stand for any such proposition. Each of those cases simply held that a particular piece of evidence standing alone was insufficiently probative to justify sending a case

---

is precisely because "[a] manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market" (*id.,* at p. 762 [79 L.Ed.2d at p. 784]), that the inference of concerted action cannot be drawn in vertical price-fixing conspiracy cases only from proof of termination following competitor complaints. Because of the "important distinctions" that are at the center of distributor-termination cases, the plaintiff must provide additional evidence "that tends to exclude the possibility of independent action by the manufacturer and distributor." (*Id.,* at p. 768 [79 L.Ed.2d at p. 788].) Thus, the innocence in distributor termination cases of facts that in other antitrust contexts might appear incriminating—e.g., the sharing of information and complaints from rival distributors—in effect renders a claim in such a vertical case "implausible" if it is not supported by additional evidence.

Because *Monsanto* relates to concerns peculiar to vertical cases never thought to be relevant to horizontal cases, it has been said that *Matsushita*'s reliance on *Monsanto* is "unfair." (Calkins, *Summary Judgment, Motions to Dismiss, and Other Examples of Equilibrating Tendencies in the Antitrust System, supra,* 74 Geo.L.J. at p. 1125 and fn. 456.)

to the jury. These holdings in no way undermine the doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment." (*Matsushita, supra*, 475 U.S. at pp. 600-601 [89 L.Ed.2d at p. 561], dis. opn. of White, J., fn. omitted.)

As a result of *Matsushita, Anderson* and *Celotex* the Supreme Court "has shifted its focus away from legal cognizability and more to actual disposition of *factual* issues. The result is that summary judgment can be less of a pretrial dismissal motion and more of a kind of trial itself, a bench trial on paper." (Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court, supra*, 116 F.R.D. at p. 184, italics in original.)[5]

## II.

The new federal view of summary judgment has not been adopted by the courts of this state. For one thing, the California summary judgment statute is in certain important respects different from rule 56(e) of the Federal Rules of Civil Procedure. The first sentence of the statute provides that a party may move for summary judgment only when "it is contended that the action has no merit or that there is no defense thereto" (Code of Civ. Proc., § 437c, subd. (a)), a provision that has no counterpart in the federal rule. Our statute also specifically provides, as federal rule 56 does not, that summary judgment "shall not be granted . . . based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raises a triable issue as to any material fact." (Code of Civ. Proc., § 437c, subd. (c).) As a result of these provisions, the rule has evolved that "[w]here, as here, the moving party is a *defendant* he must either negate a necessary element of the plaintiff's case or state a complete defense. [Citation.]" (*Parsons Manufacturing Corp.* v. *Superior Court* (1984) 156 Cal.App.3d 1151, 1157 [203 Cal.Rptr. 419], italics added, citing *LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, 744-745 [176 Cal.Rptr. 224]; accord *Pultz* v. *Holgerson* (1986) 184 Cal.App.3d 1110, 1115 [229 Cal.Rptr. 531]; *Frazier, Dame, Doherty, Parrish & Hanawalt* v. *Boccardo, Blum, Lull, Niland, Teerlink & Bell* (1977) 70 Cal.App.3d 331, 338 [138 Cal.Rptr. 670];

---

[5] It has been suggested that this new attitude is more related to a desire of overburdened courts to increase the quantity of dispositions than the quality of adjudications. (See, e.g., Brunet, *The Use and Misuse of Expert Testimony in Summary Judgment* (1988) 22 U.C. Davis L.Rev 93, 94 ["Today's courts, facing more complex cases and an increasing caseload, are simply more receptive to docket clearing devices such as summary judgment"]; Miner, *Federal Courts at the Crossroads* (1987) 4 Const. Commentary 251, 255 ["courts are beginning to relax the standards for summary judgment, and I do not believe that this development is unrelated to the caseload crunch"], and Comment, *Federal Summary Judgment: The "New" Workhorse for an Overburdened Federal System* (1987) 20 U.C. Davis L.Rev. 955, 978 ["Considering the high litigation costs and crowded dockets in federal courts today, the future of summary judgment seems secure"].)

*Smith* v. *Southern Pacific Co.* (1963) 222 Cal.App.2d 728, 733 [35 Cal.Rptr. 575]; *Security First Nat. Bank* v. *Ross* (1963) 214 Cal.App.2d 424, 432 [29 Cal.Rptr. 538].)

Under the California case law it is difficult for a defendant moving for summary judgment to shift the burden of proof or of persuasion to the plaintiff. "The statute requires the trial court to consider all inferences reasonably deducible from the evidence; hence, the fact that [plaintiffs'] attorney did not urge the trial court at the original hearing on the motion to draw certain specific inferences of negligence does not relieve the trial court or this [appellate] court from a duty to take those inferences into account." (*Maxwell* v. *Colburn* (1980) 105 Cal.App.3d 180, 185 [163 Cal.Rptr. 912]; accord *Hepp* v. *Lockheed-California Co.* (1978) 86 Cal.App.3d 714, 719 [150 Cal.Rptr. 408].)

Though the Supreme Court was more explicit on the point in *Celotex* and *Anderson, Matsushita* also suggests that the burdens of coming forward and of persuasion may justifiably be shifted to a plaintiff resisting summary judgment because the latter must ultimately bear those burdens at trial. As pointed out by the trial judge and in the lead opinion, such a rationale is incompatible with California law on the subject. In California, "[t]he placement of the burden of proof at trial does not affect the showing required for a summary judgment. (*Security Pac. Nat. Bank* v. *Associated Motor Sales* (1980) 106 Cal.App.3d 171, 179 . . . .) 'There is nothing in the [summary judgment] statute which lessens the burden of the moving party simply because at the trial the resisting party would have the burden of proof on the issue[s] on which the summary judgment is sought to be predicated. In such a case, on the motion for summary judgment, the moving party must generally [negate] the matters which the resisting party would have to prove at the trial.' (*Barnes* v. *Blue Haven Pools* (1969) 1 Cal.App.3d 123, 127 . . . .)" (*Lee* v. *Electric Motor Division* (1985) 169 Cal.App.3d 375, 382 [215 Cal.Rptr. 195].) Stated differently, the burdens substantive antitrust law imposes upon a plaintiff at trial do not in state court serve to diminish the burdens on a defendant moving for summary judgment. The similarities between the state and federal antitrust statutes cannot be permitted to obscure the significant differences between state and federal summary judgment practices, which on the state side is governed by statute.

The reluctance of California courts to ease the burdens on parties seeking summary judgment is pronounced in cases involving the existence of an agreement. (6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 308, p. 601.) Often, the surrounding circumstances are thought to give meaning to the terms of an understanding, thus presenting a question of fact. (See, e.g., *Mason* v. *Superior Court* (1985) 163 Cal.App.3d 989, 999

[210 Cal.Rptr. 63].) This judicial attitude is particularly evident in antitrust cases. As stated in *Sherman* v. *Mertz Enterprises* (1974) 42 Cal.App.3d 769 [117 Cal.Rptr. 188], "[s]ummary judgment, by its nature, should be sparingly granted in cases alleging antitrust activities by defendant. The plaintiff in such a case finds himself outside a door of information that can be opened only by obtaining the key from the defendants. Unless plaintiff is allowed to probe into the secrecy of defendants, he would forever be foreclosed from finding facts to support his contention." (*Id.*, at p. 774.)

The California Supreme Court has adopted this view. In *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842 [94 Cal.Rptr. 785, 484 P.2d 95] the court reversed a grant of summary judgment for the defendant in a Cartwright Act case primarily on the basis of several "well-established rules" governing the meaning of Code of Civil Procedure section 437c (*id.*, at p. 851), such as the rule that the affidavits in support of the moving party must in and of themselves be sufficient to sustain a judgment in his favor (*ibid.*), and the rule that "the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion." (*Id.*, at pp. 851-852.) Rules such as these, the court indicated, are necessary to insure that the "drastic" remedy of summary judgment is " 'used with caution so that it does not become a substitute for the open trial method of determining facts.' " (*Id.*, at p. 852, quoting *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].)

The *Corwin* court also relied on language in *Poller* v. *Columbia Broadcasting* (1962) 368 U.S. 464 [7 L.Ed.2d 458, 82 S.Ct. 486], that reflects a judicial sensibility hard to square with the theme of *Celotex, Anderson* and, particularly *Matsushita*: "We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.' " (*Poller, supra*, 368 U.S. at p. 473 [7 L.Ed.2d at p. 464]; quoted in *Corwin, supra*, 4 Cal.3d at p. 852.)

### III.

The trial judge in this case, who understood the difference between summary judgment procedures in federal and state courts, observed on the record that "the California courts have not yet adopted *Celotex* standards

for ruling on motions for summary judgment." For this reason, he concluded, defendant banks and trade associations, the moving parties, "have got the burden of coming forward with evidence that is fully competent to negate the allegations made against them in the complaint." It was only because he believed the defendants sustained the burden of presenting sufficient evidence negating the allegations of the complaint that the trial judge shifted to the nonmoving plaintiff the burden of establishing the existence of a triable issue of material fact.[6] The rationale of the trial judge's refusal to utilize "*Celotex* standards" applies with equal force to the *Matsushita* standards, which the judge never indicated he was even considering. As has been shown, the *Matsushita* standards are closely related to those set forth in *Celotex* and are just as difficult to reconcile with the California summary judgment statue. As has also been shown, the *Matsushita* standards represent a policy inconsistent with that adhered to by the courts of this state.

Finally, there remains some doubt whether even the federal courts would apply the *Matsushita* standard to the present case. First of all, the Cartwright Act claim in this case is not as facially implausible as the Sherman Act claims in *Matsushita* and *Monsanto* because there *is* an economic incentive to engage in the conduct charged and the alleged conspiracy is not practically infeasible. Nor would denial of summary judgment in this case "deter pro-competitive conduct," as the *Matsushita* and *Monsanto* courts both feared due to circumstances not present in this case.[7] (*Matsushita, supra*, 475 U.S. at p. 593 [89 L.Ed.2d at 556]; *Monsanto, supra*, 465 U.S. at pp. 762-764 [79 L.Ed.2d at pp. 784-785].) Moreover, the omission in the *Matsushita* opinion of any reference to the Supreme Court's earlier opinion in *Poller* v. *Columbia Broadcasting, supra*, 368 U.S. 454, which emphasizes very different policy considerations, suggests the possibility that *Poller* continues to apply in cases such as this one, in which the defendant's motive is a central issue or element of the claim. (See *First Natl. Bank* v. *Cities Service, supra*, 391 U.S. 253, 285 [20 L.Ed.2d 569, 590]; *White Motor Co.* v. *United States* (1963) 372 U.S. 253, 259 [9 L.Ed.2d 738, 744, 83 S.Ct. 696]; see also 2 Areeda & Turner, Antitrust Law (1978) § 316(b).)

---

[6] The standard applied by the trial court in this case was precisely that adopted by the Court of Appeals in *Celotex* and rejected by the Supreme Court. As stated in the Supreme Court opinion, the majority of the Court of Appeals concluded that "Rule 56(e) of the Federal Rules of Civil Procedure, and this Court's decision in *Adickes* v. *S. H. Kress & Co.*, 398 U.S. 144, 159 (1970), establish that 'the party opposing the motion for summary judgment bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact.' 244 U.S.App.D.C., at 163, 756 F.2d, at 184 (italics in original; footnote omitted)." (*Celotex, supra*, 477 U.S. at pp. 321-322 [91 L.Ed.2d at pp. 272-273], fn. omitted.)

[7] Conducting trade association meetings does not constitute "procompetitive behavior" within the meaning of *Matsushita* and *Monsanto*.

In any event, because *Matsushita* is predicated on rule 56 of the Federal Rules of Civil Procedure and conflicts with the California summary judgment statute (Code Civ. Proc., § 437c) and cases interpreting that statute, the opinion in that case is not binding on California courts.

The petition of all appellants for review by the Supreme Court was denied June 27, 1990.