[No. G006661. Fourth Dist., Div. Three. July 30, 1991.]

GOLDEN WEST BASEBALL COMPANY, Plaintiff and Appellant, v.
WILLIAM O. TALLEY, Defendant and Respondent.

**COUNSEL**

Paul, Hastings, Janofsky & Walker, Christian F. Dubia, Jr., and Sean A. O'Brien for Plaintiff and Appellant.

Drummy Garrett King & Harrison, Nossaman, Gunther, Knox & Elliott, Howard F. Harrison, Alan J. Droste and Alan I. White for Defendant and Respondent.

## OPINION

SILLS, P. J.—Golden West Baseball Company, operator of the California Angels baseball club, appeals after the trial court granted summary judgment in favor of defendant William O. Talley, former city manager of the City of Anaheim (the City). Golden West sued Talley for fraud, but as damages alleged only attorneys' fees incurred in a prior action against the City. We find Golden West is not entitled to recover such damages. Further, Talley made an uncontradicted showing that he was immune from liability under Government Code section 822.2. Finally, there was no triable issue that Golden West, as a sophisticated business entity, justifiably relied on anything Talley said. Accordingly, we affirm.

### FACTS

In 1964, the Los Angeles Angels agreed to move to Anaheim, where they would become the California Angels. At that time, Golden West entered into a written agreement with the City to lease Anaheim Stadium "and accessory and appurtenant facilities, on dates and at times to be designated as hereinafter provided during the term hereof, for the playing and exhibition of LESSEE's [Golden West's] home baseball games . . . ." The agreement earlier stated "[i]t is understood and agreed that the 146 acres above referred to [i.e., the total amount of land acquired for the Anaheim Stadium complex], except to the extent occupied by the stadium, and to the extent necessary to provide the minimum parking for stadium use together with adequate egress and ingress, shall be under the exclusive control of LESSOR [the City] and is not in any way bound to use for LESSEE."[1] The City further agreed as follows: "No reduction or diminution in any of the facilities, equipment or improvements . . . shall be made during the continuance of this Lease Agreement without the advance written consent of LESSEE."

As far as this case is concerned, the trouble began when the national pastime collided with the American obsession. In 1977 the Los Angeles Rams football team, like the Angels themselves 13 years earlier, expressed a desire to move south to Anaheim. According to Golden West, Talley (while serving as city manager) conceived the idea of creating an "incentive package" to lure the Rams from Los Angeles. This package would allow the Rams to participate in a commercial development of a portion of the Anaheim Stadium parking lot. In furtherance of this proposed development, a general partnership called Anaheim Stadium Associates (ASA) was formed, with the Rams holding a partial interest.[2]

---

[1] Golden West alleged in its original and amended complaints that the 1964 lease provided for "ground level parking." The agreement, however, contains no such express language.

[2] ASA was composed of Ramco (a limited partnership) and CC&F Stadium Properties, Inc. According to Golden West, Ramco is owned and controlled by the owners of the Rams.

Golden West believed the 1964 agreement gave it a leasehold interest in the stadium parking lot; if so, this might well preclude the City from leasing a portion of the parking lot to ASA for commercial development. According to Golden West, Talley knew Golden West's interpretation was correct, and Talley therefore "conceived of a plan and scheme to defraud the Angels out of their leasehold interest in the Anaheim Stadium parking lot." In furtherance of the scheme, Talley allegedly misrepresented to ASA that Golden West did not have a leasehold interest in the parking lot, but rather a nonspecific right to 12,000 parking spaces, and that this right could be fulfilled if the City built parking garages to handle the cars. As a result of this alleged misrepresentation, ASA and the City executed a ground lease in November 1978. Talley allegedly concealed this fact from Golden West, but Golden West admitted it learned of the ground lease through other sources. Talley also allegedly never told ASA of a 1972 judgment declaring that Golden West had a taxable possessory interest in the parking lot because it had the exclusive right to use and possess the parking lot on home game days.

The other portion of Talley's "scheme" involved misrepresentations to Golden West. In early 1980 Talley proposed amending the 1964 lease agreement. Golden West believed the amendment changed its leasehold rights to the parking lot. Talley supposedly misrepresented his "good faith belief" that Golden West possessed only a nonspecific right to 12,000 parking spaces. Talley also allegedly failed to disclose that City attorneys disagreed with his interpretation of the 1964 agreement. After 19 months of negotiations, Golden West and the City entered into a revised lease. The amendment recited the parties had a "good faith dispute" as to the meaning of the 1964 agreement. The agreement stated the parties would attempt in good faith to agree to plans modifying the parking facilities before the issuance of any building permits. The agreement further stated that, in the event they could not agree, "nothing contained in this agreement shall constitute a modification or waiver by City or Angels of any rights they may otherwise have under said 1964 Agreement with respect to said parking facilities." Talley allegedly told Golden West that, by agreeing to the amendment, all of its rights under the 1964 agreement would be preserved.

In late 1982, Golden West became aware that ASA and the City intended to proceed with the parking lot development. Golden West objected to the development at that time, relying on the provision in the 1964 agreement which required the written consent of Golden West before any "reduction or diminution in any of the facilities . . . ." When its objection went unheeded, Golden West filed a quiet title action, Golden West Baseball Co. v. City of Anaheim et al. (Super. Ct. Orange County, 1983, No. 409246), which the parties refer to as the "Parking Lot Action (hereafter the Parking Lot

Action)." According to Golden West's complaint in the present case, it "would not have been required to bring the Parking Lot Action but for Talley's fraudulent and deceitful conduct . . . ." Golden West alleged it had incurred over $1 million in legal fees to pursue the Parking Lot Action, and would in all likelihood incur additional fees. These were the only actual damages alleged by Golden West.

As discovery progressed in the Parking Lot Action, Golden West allegedly became aware for the first time that the City officials who drafted the 1964 agreement had no intent to merely convey a nonspecific right for 12,000 parking spaces. Golden West thus concluded "that there [was] no basis whatever for the position Talley [had] been asserting all along . . . ." Golden West also became aware that, by signing the 1981 amendment, it may not have preserved all of its rights under the 1964 agreement, since the City asserted as a defense in the Parking Lot Action that Golden West never fulfilled the condition precedent of "attempting to agree" on plans for modifying the parking facilities. Golden West allegedly signed the 1981 amendment based solely on Talley's representation that all rights under the 1964 agreement would be preserved.

In the present action, Talley eventually filed a motion for summary judgment. Talley asserted, inter alia, that necessary elements of a fraud cause of action (particularly reliance) were missing, based on Golden West's pleadings and upon Talley's accompanying declaration. That declaration stated in pertinent part that, during all relevant times during negotiations: (1) All of his conduct was in his capacity as city manager and not as an individual; (2) He did not know or believe that his interpretation of the 1964 lease agreement was incorrect or differed from that of city officials who originally drafted that agreement; (3) It was not his understanding that Golden West would lose any rights under the 1964 agreement by signing the 1981 amended lease; (4) He did not know of the 1972 judgment that Golden West possessed a taxable interest in the parking lot; and (5) He acted in what he believed was the best interests of the City and was not motivated by corruption or actual malice toward Golden West.

Golden West opposed Talley's motion with an avalanche of paper consisting of over 650 pages. In attempting to refute Talley's declaration that he was acting at all times in the course of his employment, Golden West offered no supporting evidence, but did assert the following contention: "This 'fact' [course of employment] is an inadmissible conclusion and is not sufficient— *even though uncontradicted*—to support a motion for summary judgment. Talley's self-serving declaration that he was acting within the scope of his employment is insufficient to establish this fact as undisputed. Moreover, the

issue of whether Talley was acting within the scope and course of his employment—while perpetrating a fraud on the Angels and ASA—should not be determined on a summary judgment motion." (Italics added.)

Golden West presented similar "opposition" to Talley's statement in his declaration that he was not motivated by corruption or actual malice. It again offered no opposing evidence, but merely stated: "Talley's self-serving declaration is a legal conclusion and is insufficient to negate a triable issue of material fact as to his intent. Where, as here, the moving party's evidence on the issue of intent consists only of a self-serving declaration, summary judgment should be denied."

Golden West's showing to negate Talley's assertion of lack of reliance was somewhat more elaborate. Perhaps the most important piece of opposing evidence on this issue was the declaration of Arthur E. "Red" Patterson, former vice-president and assistant to the chairman of the board of Golden West, Gene Autry. Patterson confirmed that when Talley initially proposed amending the 1964 lease agreement, Golden West immediately objected, stating it had a leasehold interest in the parking lot and that any development would require its approval. In response, Talley stated his "good faith belief" that the 1964 agreement only allowed Golden West to park 12,000 cars on game days. Throughout negotiations the positions of the parties did not change. According to Patterson, the only reason Golden West eventually signed the 1981 amended lease was because of Talley's representation that all of Golden West's rights under the 1964 agreement would be preserved.

Patterson further stated that in January and February 1983 he attended two meetings of the Anaheim Planning Commission, at least one meeting with Talley, and a meeting of the Anaheim City Council. Patterson voiced objections to the proposed ASA development at all of these meetings. The city council nonetheless approved the proposal, and Golden West filed suit against the City and others in August 1983.[3]

---

[3]In addition to the Patterson declaration, Golden West offered portions of a number of exhibits which supposedly were relevant to the "reliance" issue. We daresay that attempting to analyze this evidence would prove a mind-numbing exercise for any court. Golden West first presented isolated pages of testimony from three witnesses in the trial of the Parking Lot Action, Leonard Smith, Arthur Gray, and Laurence Strenger. However, Golden West never bothered to identify who these people were or to explain their connection to the case (Smith is elsewhere identified as the former president of ASA). Even if they had been identified, their testimony would seem to be of little help. Smith testified he told city officials that he thought the ASA project would violate the 1964 lease agreement. Gray corroborated this testimony. Strenger testified he talked with Talley frequently. We are at a loss to see how this testimony is relevant to the issue of reliance.

Golden West also offered documentary evidence. The first document was an attachment to a letter from ASA to Talley; it is apparently a memorandum from assistant city attorney Frank

In his reply papers Talley asserted that Golden West produced no evidence creating a triable issue of fact as to whether he acted in the course of employment or whether he acted without actual malice or corruption, and therefore his conduct was immune from suit under Government Code section 822.2. Talley also contended that Golden West had failed to show it had justifiably relied on any of Talley's representations. Finally, Talley objected to nearly all of Golden West's evidence, largely on grounds of hearsay, lack of foundation, and lack of authentication.[4]

At the hearing on the motion for summary judgment, the trial court stated there were "many factual issues," but felt the case turned upon the legal issue of whether Golden West could circumvent Code of Civil Procedure section 1021, which codifies the "American Rule" that parties generally must pay their own attorneys' fees. The court analogized Talley's position as city manager to that of a corporate officer, and stated that a party suing the corporation could not "turn around and sue that corporate officer for his costs in pursuing the main action . . . ." The court granted the motion for summary judgment, and this appeal followed.

## DISCUSSION

### I

*Golden West's Action Is Essentially One for Attorneys' Fees Incurred in Its Action Against the City, and It Cannot Avail Itself of the "Tort of Another" Exception to the General Rule That Each Party Must Pay Its Own Attorneys' Fees.*

■ Golden West admits that the only element of damages it claims in its action against Talley is the attorneys' fees it incurred in prosecuting the

---

Lowery stating that the ASA proposal "appears to violate Angels' Lease." The second document is a letter dated January 10, 1979, from Golden West to the City, stating that Golden West expected the City to honor the 1964 lease agreement. Again, we are hard pressed to see how these documents are relevant to the "reliance" issue. The best that can be said of all of this evidence is that Golden West's interpretation of the 1964 agreement was shared by others, which would seem to undercut its contention that it relied on Talley to any meaningful degree.

[4] The trial judge never ruled on these objections, many of which appear to be meritorious. We are troubled that the absence of such a ruling works in favor of Golden West, especially since it failed to respond to Talley's objections. Under Code of Civil Procedure section 437c, subdivision (c), the trial court is required to consider all evidence "except that to which objections have been made and *sustained* by the court, . . ." (Italics added.) One court has held that the failure to secure a ruling waives the objection, even where the objection was made by the party who eventually prevailed on summary judgment. (*Haskell* v. *Carli* (1987) 195 Cal.App.3d 124, 129 [240 Cal.Rptr. 439].) The terms of the statute would seem to mandate such a waiver.

Parking Lot Action. The lease agreement between Golden West and the City contained no "attorney fee" provision, a typical device used by contracting parties to allow the award of attorneys' fees in the event of litigation concerning the contract. (See Civ. Code, § 1717.) Thus, in the absence of such a contractual provision, Golden West would seem to be subject to the American Rule, codified in Code of Civil Procedure section 1021, that each party is to bear its own attorneys' fees.

Golden West claims its suit against Talley for attorneys' fees incurred in its action against the City is permissible under an exception to the American Rule known as the "tort of another" doctrine. This doctrine "allows a plaintiff attorney fees if he is required to employ counsel to prosecute or defend an action *against a third party* because of the tort of the defendant." (*Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763], italics added; see Rest.2d Torts, § 914, subd. (2).) Golden West claims it was forced to employ counsel to prosecute the Parking Lot Action because of Talley's misrepresentations. The italicized portion of the quotation from Gray, however, frames the question we must answer here: Is the relationship between Talley and the City such that the City can be considered a third party?

The trial court found this question to be one of first impression in California, and our research has confirmed that fact. Issues of first impression often present close questions, but we believe the facts of this case lead to an obvious conclusion. Golden West has conceded, as it must, that Talley acted as a representative of the City during all the negotiations concerning the lease. Further, Golden West offered no evidence that Talley acted outside the scope of his employment with the City at any relevant time. (See part II of this opinion, *post.*) Golden West never even presented a theory as to how Talley's interests could possibly be divergent from those of the City. Under these circumstances we hold that an employee cannot be sued under the "tort of another" doctrine to recover attorneys' fees incurred in an action against the employer unless it is shown the employee was not acting on behalf of the employer.

Our holding is supported by sound policy considerations. First, as a general rule, our Supreme Court has stated it has "moved cautiously in expanding the nonstatutory bases on which awards of attorney's fees may be predicated." (*Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 636 [150 Cal.Rptr. 461, 586 P.2d 942].) Perhaps more important, however, are the practical ramifications which would ensue were we to hold otherwise. If Golden West were allowed to maintain this lawsuit, a second lawsuit would inevitably follow every successful action against an employer. Discovery and trial would identify the employees responsible for tortious conduct, and they in

turn would become defendants in a second suit to recover the attorneys' fees expended in the first. Moreover, the employer would inevitably be required to pay the "damages" of the second suit. In this case, for example, the City would be required to pay any judgment based on Talley's act or omission occurring within the scope of his employment. (Gov. Code, § 825, subd. (a).) We agree with the trial court that, in attempting to invoke the "tort of another" doctrine, Golden West is merely trying to circumvent the American Rule. We decline to expand the doctrine in such a fashion.

None of Golden West's many cited authorities compels a different result. In *Saunders* v. *Cariss* (1990) 224 Cal.App.3d 905 [274 Cal.Rptr. 186], a pleading case, the court held that plaintiff Saunders could recover from Cariss, his insurance agent, the attorneys' fees incurred in "persuading" his insurance company to pay the policy limits on an uninsured motorist claim. Saunders had alleged Cariss forged his signature to "reduction agreements" consenting to the reduction of uninsured motorist coverage from $100,000 to $15,000. (*Id.* at p. 907.) When the insurer initially refused to pay any more than $15,000 on a covered claim, Saunders was forced to hire an attorney, who quickly convinced the insurer to pay the full $100,000. We agree with *Saunders*; however, the issue of whether Cariss was acting on behalf of the insurer when he forged the signature was not raised. Based on the facts recited in the opinion, such a course of conduct seems unlikely, and thus is a far cry from the nature of Talley's conduct here.[5]

Golden West also attempts to rely on cases where the employee or agent was clearly not acting on behalf of the employer or principal. For example, in *Howard* v. *Schaniel* (1980) 113 Cal.App.3d 256 [169 Cal.Rptr. 678], plaintiff prevailed against a seller in a quiet title action and then successfully sued the seller's broker for the attorneys' fees incurred in the quiet title action. However, the broker in *Howard* was found to have "acted on his own behalf, without the knowledge of [the seller] and not in [the seller's] best interests; . . ." (*Id.* at p. 261.) Similarly, in *Phil Crowley Steel Corp.* v. *Sharon Steel Corp.* (8th Cir. 1986) 782 F.2d 781, the court specifically found that a parent corporation's conduct was contrary to the interests of a subsidiary; thus, attorneys' fees were recoverable against the parent where it had interfered with a plaintiff's contract against the subsidiary. (*Id.* at p. 784.) In the present appeal, however, Talley's conduct was clearly in harmony with the interests of the City. Under these circumstances, the "tort of another" doctrine cannot apply.

---

[5]*Saunders* is also distinguishable because, even if Cariss had been acting on behalf of the insurer, attorneys' fees would still have been recoverable under another exception to the American Rule. In *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796], our Supreme Court held that an insurer is liable when its "tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy." (*Id.* at p. 817.)

Finally, Golden West asserts that, even if the City is not considered a "third party," it was also forced to sue ASA in the Parking Lot Action, and thus the doctrine should apply. While we agree that ASA is a third party, it does not change the result here. Golden West's primary contention in the Parking Lot Action was that the City could not allow any commercial development without Golden West's consent. As far as Golden West was concerned, the City could not develop the parking lot, nor could it allow a third party such as ASA to develop it, without Golden West's consent. Thus, the presence of ASA does not change the basic character of the Parking Lot Action, which was directed primarily against the City. We decline to hold that the naming of ASA in the Parking Lot Action magically transforms nonrecoverable attorneys' fees into recoverable damages.

## II

*Golden West Failed to Present a Triable Issue That Talley's Conduct Was Not Privileged Under Government Code Section 822.2.*

Even if the "tort of another" doctrine were applicable, Talley was protected by governmental immunity. ■ Government Code section 822.2 provides: "A public employee acting in the scope of his employment is not liable for an injury caused by his misrepresentation, whether or not such misrepresentation be negligent or intentional, unless he is guilty of actual fraud, corruption or actual malice."[6] The misrepresentation must apply to interferences with financial or commercial interests. (*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 800 [73 Cal.Rptr. 240, 447 P.2d 352].) The term "actual malice" as used in the statute has been defined as "a conscious intent to deceive, vex, annoy or harm the injured party in his business." (*Schonfeld* v. *City of Vallejo* (1975) 50 Cal.App.3d 401, 410 [123 Cal.Rptr. 669].)[7] The term "actual fraud" likewise appears to require an intent to deceive or to induce action of some sort. (Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 2.79, p. 170.)

■ Talley was entitled to immunity under section 822.2 if he made an uncontradicted showing that: (1) he was acting in the course of his

---

[6]All further statutory references are to the Government Code unless otherwise specified.

[7]The term "actual malice" has different meanings, depending on the context in which it is used. The term is particularly confusing in defamation cases. Under a First Amendment analysis, "actual malice" means that a publisher disseminated an item knowing it to be false or entertaining serious doubts as to its truth. (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706-707, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].) Civil Code section 48a, subdivision 4(d), however, defines actual malice as a "state of mind arising from hatred or ill will toward the plaintiff." (See *Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 257 [208 Cal.Rptr. 137, 690 P.2d 610], explaining the distinction between "constitutional malice" and "common law malice.")

employment; and (2) he was not guilty of actual fraud, corruption, or actual malice. As to the first requirement, Talley stated in his declaration that he at all pertinent times was acting in the course of his employment as city manager. Golden West admitted it could not contradict this statement, but stated it was an "inadmissible conclusion" and could not support a summary judgment motion. Golden West is in error. In *Leake* v. *Wu* (1976) 64 Cal.App.3d 668 [134 Cal.Rptr. 616], the defendant submitted a declaration in support of his motion for summary judgment stating that at the time of his alleged negligent conduct he was a full-time county employee acting in the course and scope of his employment. Plaintiff offered no evidence in opposition, but argued that defendant's "allegations of employment and acting within the scope of employment were mere conclusions." (*Id.* at p. 670, fn. 3.) The trial court granted summary judgment and the Court of Appeal affirmed, holding that the uncontroverted declaration established defendant's status as a county employee acting in the course of that employment. (*Id.* at p. 670.) The *Leake* court relied on our Supreme Court's decision in *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 169 [95 Cal.Rptr. 623, 486 P.2d 151], where the status of a person as a nonemployee was established solely by an uncontradicted declaration.

Similar to *Leake* is *Dawson* v. *Rash* (1958) 160 Cal.App.2d 154 [324 P.2d 959]. The issue in *Dawson* was whether a deputy building inspector was acting in the course of his employment. Both defendant and his supervisor submitted affidavits in support of defendant's motion for summary judgment that he was acting in the course of his employment. Plaintiff's only opposition on this issue was her affidavit that defendant was not acting in the course of his employment. The Court of Appeal affirmed the granting of summary judgment, stating "we are convinced that no issue was presented as to whether respondent was acting in his official capacity as deputy building inspector." (*Id.* at p. 160.) We agree with *Leake* and *Dawson*, and hold that Talley's uncontroverted declaration established he was acting in the course of his employment. Talley's declaration is particularly dispositive where Golden West never asserted a theory as to how Talley could be acting *outside* the course of his duties as city manager.

Talley was also required under section 822.2 to show he was not guilty of actual fraud, corruption, or actual malice. As established by the definitions quoted above, the issue here is Talley's intent, or state of mind. Talley's declaration stated he "was not motivated by corruption or actual malice or by the conscious intent to deceive, vex, annoy or harm Plaintiff in its business or at all." Admittedly, this is a self-serving statement, but where (as here) it is uncontradicted, case law establishes that such a showing can provide the basis for summary judgment. For example, in *Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656 [150 Cal.Rptr. 384, 12 A.L.R.4th 27], a doctor in a personal

injury action submitted an affidavit in support of his summary judgment motion stating he "did not bear any malice, reckless disregard or desire to harm" plaintiff. (*Id.* at p. 668.) The court held this affidavit "was sufficient to negate any charge of malice, in the absence of counteraffidavits." (*Ibid.*) Similarly, in *McCunn v. California Teachers Assn.* (1970) 3 Cal.App.3d 956 [83 Cal.Rptr. 846], lack of malice in a libel case was established solely by uncontradicted declarations and deposition testimony of the defendants. (*Id.* at pp. 960-962.) Finally, in *Hosking v. Spartan Properties, Inc.* (1969) 275 Cal.App.2d 152 [79 Cal.Rptr. 893], the court held that an uncontradicted affidavit was sufficient to support a motion for summary judgment on causes of action for fraud and misrepresentation. (*Id.* at p. 157.)

Code of Civil Procedure section 437c, subdivision (e) provides that a court has discretion to deny a motion for summary judgment where the material fact is the individual's state of mind and where that fact is sought to be proven solely by the individual's declaration. As the cases cited above establish, however, the converse is also true, and a court has the discretion to grant a motion for summary judgment under such circumstances as well. (See *Overland Plumbing, Inc. v. Transamerica Ins. Co.* (1981) 119 Cal.App.3d 476, 483 [174 Cal.Rptr. 1].) We find no abuse of such discretion in believing Talley's uncontradicted declaration and finding him immune from liability under section 822.2.

## III

*Golden West Presented No Evidence It Justifiably Relied on Talley's Interpretation of the 1964 Lease Agreement or the 1981 Amended Lease.*

 One of the elements of fraud is justifiable reliance. (See, e.g., *Khan v. Shiley Inc.* (1990) 217 Cal.App.3d 848, 858 [266 Cal.Rptr. 106].) While this issue is normally a question of fact, it becomes a question of law where the undisputed facts leave no room for a reasonable difference of opinion. (*Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1475 [266 Cal.Rptr. 593].)

We cannot help but be struck by Golden West's theory of its case, as evidenced by its original and amended complaints. Golden West believed the 1964 agreement conferred a leasehold interest in the parking lot, while Talley (allegedly without justification) stated it did not. This disagreement led to 19 months of negotiations, culminating in an amended lease which recited there was a "good faith dispute" as to the meaning of the 1964 agreement. Negotiating for 19 months is inconsistent with any claim of

justifiable reliance, particularly since Golden West did not change its position: It still believed it was right.

Golden West also claimed that Talley misrepresented the meaning of the 1981 amended lease when he stated that all of Golden West's rights under the 1964 agreement would be preserved. Under one interpretation of the amendment, those rights were preserved only if Golden West first attempted in good faith to agree on plans and specifications for the parking lot, a condition not required under the 1964 agreement. Red Patterson stated that Golden West never would have signed the amendment but for Talley's statement. However, it requires some degree of business sophistication to operate a major league baseball club in this day and age. We would be naive to think Golden West would enter into any agreement without consulting its lawyers, and Golden West would thus be hard pressed to claim it justifiably relied upon a layman's interpretation of a legal document. (*Perlick* v. *Pac. Discount Corp.* (1942) 53 Cal.App.2d 136, 141 [127 P.2d 647]; see also *Agnew* v. *Foell* (1952) 113 Cal.App.2d 575, 577 ("a legal opinion by a layman cannot constitute the basis of recovery for fraud").) While we are not prepared to say that a legal opinion by a layman can never give rise to a cause of action for fraud (cf. *Bank of America* v. *Sanchez* (1934) 3 Cal.App.2d 238, 242-243 [38 P.2d 787]), we can confidently say that an organization such as Golden West could not, as a matter of law, reasonably rely on the legal opinion of a layman under these circumstances. This is particularly true since Golden West had equal access to all the relevant information concerning the terms of the lease.

## CONCLUSION

Whatever the merits may have been in the Parking Lot Action, we believe Golden West's attempt to recoup its attorneys' fees through this separate lawsuit was ill-advised. Since there were no triable issues of fact on the key issues discussed above, the judgment is affirmed.

Crosby, J., and Wallin, J., concurred.