[No. A112815. First Dist., Div. Two. Apr. 9, 2007.]

SHERMAN DEMPS, Jr., Plaintiff and Appellant, v.
SAN FRANCISCO HOUSING AUTHORITY et al., Defendants and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

COUNSEL

Law Offices of Curtis G. Oler and Curtis G. Oler for Plaintiff and Appellant.

Cholakian & Associates, Kevin K. Cholakian, Colin H. Jewell, David J. Streza; Walsworth, Franklin, Bevins & McCall, Randall J. Lee and Laurie E. Sherwood for Defendants and Respondents.

OPINION

**RICHMAN, J.**—Paraphrasing Alexander Pope, a court "should never be ashamed to own [it] has been in the wrong; which is but saying, in other words, that [it] is wiser today than [it] was yesterday." (Swift, *Thoughts on Various Subjects* in Miscellanies in Prose and Verse (1727) vol. I, p. 340.)

█ We write today to "own" that the procedure we approved in *Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410 [267 Cal.Rptr. 819] (*Biljac*) was wrong. There, in affirming a summary judgment, we held that a trial judge need not rule on each evidentiary objection, but could preserve the record by simply stating that " 'I am going to disregard all those portions of the evidence that I consider to be incompetent and inadmissible.' " (*Id.* at p. 1419, fn. 3.) Today, seemingly wiser, we reject that holding, and hold instead, as dictated by two California Supreme Court cases and consistent with all published, post-*Biljac* Court of Appeal opinions, that a trial judge's failure to rule on properly presented objections results in their being waived, the effect of which is that the objected-to evidence is in the record for purposes of appellate review.

█ The trial judge here expressly stated that he was relying on *Biljac*, and went on to grant summary judgment for defendants San Francisco Housing Authority (Housing Authority) and Michael Roetzer, its administrator. We must thus determine, on our independent review, whether that summary judgment was correct in light of all the evidence in the record. We conclude that it was, and we affirm.

## I. BACKGROUND

### A. *Demps and His Employment*

Plaintiff Sherman Demps, Jr., is an African-American man, born in 1948; he was 57 years old when the events leading to this lawsuit took place. Demps has an associate of arts degree from San Francisco City College,

following which he attended two universities; he is 12 units short of a degree in hotel and restaurant management.

Following honorable service in the military, Demps had a broad employment background, working for United Airlines, various restaurant chains, and security firms. In 1994 Demps began employment with the Housing Authority as a security officer. In April 1996 he became a resident custodian at 1880 Pine Street (1880 Pine), a housing complex owned and operated by the Housing Authority, whose occupants are senior citizens and disabled people. Demps remained in that position until the fall of 2002, when he was terminated.

The Housing Authority entered into a memorandum of understanding with Service Employees International Union, Local 1877, of which Demps was a member in good standing. Apparently this memorandum governed the relationship between the Housing Authority and the union members, including custodians, but no issues are presented in connection with it.

The full range of Demps's duties at 1880 Pine were described in a job description introduced by him, included among which was that he "move and set up furniture and equipment." As distilled in the declaration of Ignatius Leonor, the Housing Authority district director for district 3, Demps was responsible for performing a full range of custodial tasks, including picking up papers, garbage, and other rubbish, washing and cleaning stairways and hallways, inspecting the building and grounds for vandalism and unsafe or unhealthy conditions, and reporting evidence of problems with Housing Authority property or equipment.

As a condition of his employment as resident custodian, Demps was required to occupy a unit at 1880 Pine, though he was not under any lease. Under the memorandum of understanding, he was required to be available to the Housing Authority five days a week, 24 hours per day. He was also required to use Housing Authority property only for authorized activities in connection with his official duties. And Demps admitted—it was undisputed, he responded—that as "a resident custodian [he] occupied a position of trust because he had direct contact with disabled and elderly residents and had access to their occupied residences."

Demps's declaration in opposition to the motion for summary judgment stated that he was "never informed by [his] supervisor, Ignatius Leonor, or anyone else at any time that [he] was not performing [his] job in a competent manner." No directly contrary evidence was introduced by the Housing

Authority, nor did it take issue with Demps's statement that he never received a work performance evaluation. In short, Demps's employment history at the Housing Authority until 2002 was generally uneventful—with the lone, but significant, exception of his relationship with Linda Bray, who was apparently Demps's antagonist from the beginning and would become the protagonist in the events which would ultimately lead to his termination.

Bray was a Caucasian woman in her fifties, and had been a tenant at 1880 Pine before Demps began his employment there. And to put it mildly, she and Demps did not get along. Demps's declaration describes their relationship as follows: "11. Almost from the very beginning of my employment as Resident Custodian at the 1880 Pine Street address, I began experiencing extraordinary nonstop harassment and extreme abuse by Linda Bray, a white female tenant there. That egregious harassment continued throughout the full term of my employment with the full knowledge of and aided, abetted and encouraged by defendants Michael Roetzer and the San Francisco Housing Authority. [¶] 12. Linda Bray's abhorrent abuse over the several years of my employment, included but was not limited to false and malicious complaints to my supervisors relating to my work performance and conduct, constant harassment of persons visiting my unit, abusive verbal and physical attacks upon my roommate, continuously confronting me in a hostile, provocative manner, constantly addressing and referring to me as a 'pimp,' 'drug dealer' and 'pimping drug dealer,' continuously filing false police reports against me, necessitating my filing a civil action for defamation against her. [¶] Linda Bray also constantly without cause confronted tenants in the building in a hostile threatening manner with a variety of baseless accusations." Demps's declaration attached copies of documents reflecting what he called "the endless stream of harassment conduct by Linda Bray," and went on to state that he had "copies of 100 or more documents including false police reports, and vexatious civil actions reflecting the abuses of Linda Bray against me and others."

There was no declaration from Bray. However, Michael Roetzer and the Housing Authority's (when referred to collectively, defendants) reply to Demps's statement of material facts, citing various portions of Demps's deposition and his response to defendants' own separate statement, responded as follows: "With respect to Linda Bray, at no time did Demps make a complaint about an unlawful employment practice under the FEHA. Nor did he ever complain about Linda Bray to Michael Roetzer. [Citation.] Demps conceded that Linda Bray's comments were racially neutral. [Citation.] . . . He has provided no evidence that Linda Bray harassed people based on their age, race, sex, or any other protected classification. Most notably, Demps believes that Linda Bray's conduct was motivated not by his

status as a member of any protected class, but was the result of a personal animus based on Demps's support of another tenant in a court matter involving Ms. Bray. [Citation.] Finally, Demps explicitly stated that he was never sexually harassed by Ms. Bray. [Citation.]"

Beyond the rather conclusory recitations quoted above, the actual facts involving Bray can be gleaned only from certain of the documentary evidence introduced by Demps himself. These exhibits included numerous police incident reports (most of which were complaints *by* Bray and one a complaint *against* Bray) and an order from the San Francisco Superior Court on a petition for injunction prohibiting harassment brought by Bray, but which resulted in an injunction against her.

Demps's documentary evidence also included four letters he wrote, on April 13, 1999, an unspecified date in January 2000, August 7, 2000, and May 31, 2001. The first of these letters, to Housing Authority Property Manager Henry Khan, responded to the charge by Bray that Demps called her a "bitch." And the third letter confirmed that Demps had been advised by Khan that "there was nothing he could do" about Bray. Interestingly, and as particularly pertinent to the issue here, in that third letter Demps referred to "someone complain [*sic*] about me that I was bringing in homeless people to work for me." This, as noted, was in August 2000.

However bad the relationship between Demps and Bray had been, it sunk to its nadir in July 2002 when Bray accused Demps of attempting to kill her. The details of the alleged crime are nowhere in the record, nor are the details of the actual proceedings filed. What is in the record is Demps's declaration testimony that at some point "the District Attorney's office subsequently terminated that unfounded criminal case against [him] and dismissed the case."

The criminal charge of attempted murder caused the Housing Authority to investigate, in the course of which it learned information that would lead to the termination of Demps's employment. What precisely occurred in connection with this investigation is, like so much of the story here, not in the record. Whatever it was, something occurred which generated a 10-page handwritten letter from Demps dated September 23, 2002. The letter was addressed to District Director Leonor, and its subjects were "Ms. Linda Bray, # 606 [and] Johnny Celestine." What that letter revealed was described by Leonor in his declaration in support of defendants' motion: "Demps admitted he paid neighborhood panhandler and known drug-user Johnny Celestine to move furniture out of the hallways at the senior and disabled housing

complex located at 1880 Pine Street once a month or every two or three months." Further, Leonor's declaration stated that Demps "also acknowledged that [Leonor] had previously warned him that hiring others to perform his work in the building would result in his termination."

What occurred next is again not in the record, but as best we can determine from Demps's evidence, Leonor prepared a memorandum dated October 4, 2002, which, according to Demps, proposed "the termination of [his] employment." The memorandum was not introduced below, and what we know of it is yet again from Demps. According to him, the memorandum proposed the termination of his employment because he was "guilty of 'acts of gross misconduct; unauthorized use of Housing Authority property; dishonesty, unsatisfactory job performance; conduct that reflect [sic] negatively on the Housing Authority; and non-compliance with Authority Safety Standards.' "

Elaborating on those charges, and at the same time taking issue with them, Demps's declaration went on: "said blatantly false and fabricated accusations were charged as: a. *Failure to Perform Assigned Work and Unauthorized Use of Housing Authority Property.* In pertinent part, said charge falsely states that I hired Johnny Celestine, a panhandler to perform my job duties at 1880 Pine Street, three nights per week for the past two years, and that I gave him $15.00 to $30.00 each night to sweep and mop floors, set up tables for meetings, and clean stairwells. Such charges are completely false and unsupported as already referred to in paragraphs 17, 18 and 19 above. [¶] b. *Gross Negligence and Non-Compliance With Authority Safety Standards.* This charge knowingly and falsely presents the misleading and [sic] statement that I allowed a known drug user, Johnny Celestine, access to said premises when in fact my supervisor was always cognizant of the presence of Celestine in the neighborhood even before I became employed at 1880 Pine. Celestine was known to most of the tenants who trusted him and who often had him do odd jobs for them, including Linda Bray. Celestine never harmed anyone while providing needed services to tenants at their request. [¶] Thusly, the charge here of Gross Negligence and Non-Compliance with Authority Safety Standards is fabricated and ludicrous. [¶] c. *Conduct that Reflects Negatively on the Housing Authority.* The sole basis for this equally false and ludicrous charge is that at some time and place I addressed Linda Bray as a 'bitch' to her face and also referred to her as same when speaking to Celestine. [¶] Such charge is absolutely false and unsupported. I have at no time addressed or referred to Linda Bray or any other tenant as a 'bitch.' [¶] d. *Making False Statements During An Official Investigation.* The charge that I made false statements during an investigation is absolutely false and as ludicrous as the above fabricated charges against me. At no time have I ever made a false

statement to the Housing Authority or anyone else concerning my employment by the Housing Authority. Defendant presents no credible evidence to support their scurrilous charges which have been simply designed to justify the termination of my employment."

According to a November 18, 2002 letter from administrator Roetzer, a *Skelly* meeting[1] was scheduled for November 15, 2002. Demps apparently chose not to attend, but had Cesar Alvarado, his union representative, appear on his behalf. Roetzer's letter also memorialized what occurred: "At the meeting, Mr. Alvarado did not provide any additional information. He did not dispute that you had hired Johnny Celestine to perform work at the 1880 Pine Street building, your assigned work site, or that you referred to a resident in derogatory terms. In addition, I reviewed the evidence supporting your termination. Based on my review of the relevant materials and your failure to provide any additional information, I am upholding the October 17, 2002, decision to terminate your employment with the Housing Authority. You were sent your final paychecks with the October 17 letter."

### B. *The Proceedings Below*

On September 10, 2004, Demps filed a complaint for "Declaratory Judgment, Injunctive Relief and Damages" alleging four causes of action: (1) race, color, and national origin discrimination; (2) mental disability discrimination; (3) age discrimination; and (4) retaliation. The complaint named as defendants the City and County of San Francisco (the City), the Housing Authority, and Roetzer.

On October 15, 2004, the City filed its answer, and on November 12, 2004, the Housing Authority and Roetzer their answer. Within months the City was dismissed, and the case proceeded against the Housing Authority and Roetzer.

On June 28, 2005, the Housing Authority and Roetzer moved for summary judgment or summary adjudication. The motion was accompanied by declarations of Roetzer, Donna Martin, Housing Authority general counsel, and district director Leonor. Leonor's declaration authenticated three documents attached to the separate statement, including Demps's September 23, 2002 letter.

The basis of the motion was simple and straightforward. As to the first three causes of action, it argued that Demps's position as resident custodian

---

[1] *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774].

required him to perform certain jobs; that he was required to use Housing Authority property only for authorized activities in connection with his official duties; that while investigating the criminal charge against Demps, the Housing Authority learned that he had paid Celestine to assist him in his duties; that Demps had acknowledged that he had been warned that hiring others to assist him could result in his termination; and that "[a]s a result of Demps's misconduct and failure to perform his job duties, the Housing Authority terminated his employment in correspondence executed by . . . Roetzer." Thus, the motion contended that Demps could not establish a prima facie case for discrimination because he could not prove that he was competently performing his job. As to the fourth cause of action for retaliation, the motion argued that Demps could not establish that he engaged in a protected activity. The motion also contended that Roetzer could not be individually liable for discrimination or retaliation.[2]

On August 29, 2005, Demps filed his opposition. It consisted of a memorandum of points and authorities, his response to defendants' separate statement, his own separate statement of additional undisputed evidence, and eight declarations—of Demps, Kenneth Block, Clarence Block, Jeff St. Clair, Klara Eydinzon, Helen Miranda, Louise Hines, and Curtis Oler. Demps did not file any objections to any of the evidence submitted on behalf of defendants.

St. Clair, Eydinzon, Miranda, and Hines were tenants at 1880 Pine (or in Miranda's case, a relative of a tenant), and the essence of their testimony was that Demps was friendly, that he did a good job, and that they never saw anyone else working there. Kenneth Block was an African-American man who had been employed by the Housing Authority as a resident custodian until he was terminated in 2004, and had filed suit against the Housing Authority and Roetzer. Clarence Block, also African-American, had been employed as a paralegal from 1998 until he was "forced . . . to leave [his] employment." Oler was Demps's attorney, and his declaration attached portions of Demps's deposition.

On September 7, 2005, the Housing Authority and Roetzer filed their reply papers. They included defendants' response to plaintiff's response to the separate statement, their response to plaintiff's separate statement of undisputed facts, a reply brief, a declaration of Christi Gotvald authenticating pages of Demps's deposition, and 11 pages of objections to Demps's

---

[2] A footnote in the points and authorities contended that "[e]ven if Demps were able to establish the elements of his prima facie case, the Housing Authority has set forth a legitimate nondiscriminatory reason for Demps's termination."

evidence. The reply brief reiterated the arguments that Demps failed to demonstrate a prima facie case because he could not show competent performance of his job. Despite that the motion did not argue the point, the reply also argued that Demps failed to produce any evidence to support discrimination based on age, disability, or race.

## C. *The Summary Judgment Hearing*

The motion came on for hearing on September 12, 2005. After setting the stage for the motion, the court early on indicated its "leaning that the City shifted the burden in this instance and then the opposing side failed to present any competent evidence for the Court to find triable issues of material fact as to any of these particular causes of action. In particular, plaintiff failed to show any end [*sic*: animus] on the part of Mr. Roetzer and/or the Housing Authority. [¶] And the other point that I would make specifically regarding Mr. Roetzer is that he as an individual could not be held liable for these particular acts or alleged acts."

The court proceeded to hear argument on various issues, including whether there was any "animus . . . related to [Demps's] race, his age, or his mental disability." As counsel for the Housing Authority distilled its position at one point, "So, your Honor, there was—there was obviously a good-faith reason for the termination. It was the result of his placing our senior and disabled population in harm's way, failure to perform his job. Additionally, as we have also discussed, there was simply no evidence of any other type of animus as you, yourself, have discussed related to his race, his age or his mental disabilities. [¶] And finally, with plaintiff's contention that he was subjected to ongoing harassment by Linda Bray, as you yourself pointed out, she is a tenant and not a sole employee and, again, the harassment was not based on any protected classification under the FEHA."

As noted above, the Housing Authority and Roetzer filed objections to some of Demps's evidence. Apparently heeding the strong recommendation from the authors of a leading practical treatise, at the conclusion of the hearing counsel for the Housing Authority asked the court "that rulings be made on the objections." (See Weil & Brown, Cal. Practice Guide: Civil Practice Before Trial (The Rutter Group 2006) ¶ 10:301.5, p. 10-116.)[3] The trial court responded as follows: "Okay. The Court in this instance here

---

[3] The authors give the following advice: "**10:301.5 PRACTICE POINTER:** Be sure there is a reporter present at the law and motion hearing, and politely ask the court for an on-the-record ruling on *each* objection. Otherwise, your failure to press the matter may be treated as a waiver of the objection (see above)." The authors go as far as to quote Justice Vogel's observation in her dissenting opinion in *Gallant v. City of Carson* (2005) 128 Cal.App.4th 705, 714 [27 Cal.Rptr.3d 318], that counsel "should yell and scream and stamp his

follows *Biljac*. Until we are told otherwise by the First District, we are still following *Biljac*, okay? . . . [¶] So the Court is following *Biljac* and is only considering the relevant and pertinent evidence. Thank you, counsel."

No rulings on the objections were ever made, and on September 15, 2005, the court entered its order granting summary judgment. Addressing Demps's claims on a cause-of-action-by-cause-of-action basis, the trial court held as follows: as to Roetzer individually, that Demps was unable to establish individual liability as a matter of law; as to the Housing Authority, Demps could not establish that he was competently performing his job at the time of termination and thus could not establish an essential element of his first, second, and third causes of action; and as to the fourth cause of action for retaliation, that Demps could not establish that he engaged in a protected activity.

On October 31, 2005, the court entered judgment for defendants, from which Demps filed a timely notice of appeal.

## II. DISCUSSION

### A. *The Trial Court Erred in Proceeding According to* Biljac

As quoted above, in responding to counsel's express request for a "ruling on the objections," the trial court stated it was "following *Biljac* and is only considering the relevant and pertinent evidence." *Biljac* was, as noted, our 1990 opinion which involved an appeal from a grant of summary judgment for banks and bank trade associations on a complaint alleging violations of the Cartwright Act and the unfair competition laws. We affirmed. Doing so, we first addressed an issue involving the evidentiary objections filed by the plaintiffs and the manner in which the trial court dealt with them. As we described it, "Plaintiffs filed voluminous evidentiary objections and a request that the court give written rulings on all objections. [The trial judge] declined, however, explaining that while he found merit to some of the objections on both sides and would be disregarding all inadmissible or incompetent evidence in ruling, he saw little purpose in rendering formal rulings.[4] Plaintiffs contend that this was reversible error. We disagree. [¶] Nothing in

---

feet, or do whatever else it takes to force the trial court to rule on those objections." (Weil & Brown, Cal. Practice Guide: Civil Practice Before Trial, *supra*, ¶ 10:301.5, p. 10-116.)

[4] In a footnote at this point, the trial judge was quoted as follows: " '[W]ith respect to . . . objections that have been made by both sides to evidentiary materials submitted by the other, I do not propose to rule individually on each exception to each piece of evidence. It would be a horrendous, incredibly time-consuming task that I think would serve very little useful purpose.

the statute or rules requires a written or other formal ruling for the record, and the single case which plaintiffs cite for that proposition has no bearing on it. [¶] Plaintiffs urge that express rulings are needed for appellate review so that they, and we, can know what evidence was considered. However, there is no use in such a procedure. We review summary judgments de novo [citation], and the parties remain free to press their admissibility arguments on appeal, the same as they did in the trial court. Also, being able to identify particular flaws in the lower court's reasoning has no value because, as appellants themselves note, summary judgment must be upheld if correct on any ground—regardless of wrong 'reasons' which may have guided the court. [Citation.] More generally, it is presumed on appeal that a judge has not relied on irrelevant or incompetent evidence. [Citation.] No error occurred." (*Biljac, supra*, 218 Cal.App.3d at pp. 1419–1420.)

In December 1993, the California Supreme Court decided *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*), also an appeal from a summary judgment for the defendant, this in a premises liability case. The substance of the opinion begins with the following observation: "This case arises out of a civil complaint filed by Ann M. after she was raped at her place of employment. Unless otherwise indicated, the facts as stated herein are not in dispute." (*Id.* at p. 670.) Footnote 1 in *Ann M.* states, "In the trial court, defendants made a series of objections to evidence submitted by Ann M. in opposition to the summary judgment motion. The trial court did not rule on the objections. Because counsel failed to obtain rulings, the objections are waived and are not preserved for appeal. (Code Civ. Proc., § 437c, subds. (b) & (c); *Golden West Baseball Co.* v. *Talley* (1991) 232 Cal.App.3d 1294, 1301, fn. 4 [284 Cal.Rptr. 53]; *Ramsey* v. *City of Lake Elsinore* (1990) 220 Cal.App.3d 1530, 1540 [270 Cal.Rptr. 198]; *Haskell* v. *Carli* (1987) 195 Cal.App.3d 124, 129–132 [240 Cal.Rptr. 439].) Although many of the objections appear meritorious, for purposes of this appeal we must view the objectionable evidence as having been admitted in evidence and therefore as part of the record." (*Ann M., supra*, 6 Cal.4th at p. 670, fn. 1.) No reference was made to *Biljac*.

The Supreme Court affirmed this principle in *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1186, footnote 2 [91 Cal.Rptr.2d 35, 989 P.2d 121] (*Sharon P.*), disapproved on other grounds in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854 [107 Cal.Rptr.2d 841, 24 P.3d 493]. Again, however, there was no reference to *Biljac*.

---

[¶] I have noted the objections, and in part on both sides the objections are well taken. . . . I am going to disregard all those portions of the evidence that I consider to be incompetent and inadmissible.' " (*Biljac, supra*, 218 Cal.App.3d at p. 1419, fn. 3.)

The court's intentions were restated at the close of the hearing and again in the written order. (*Biljac, supra*, 218 Cal.App.3d at p. 1419, fn. 3.)

Beginning in 1998 various Courts of Appeal began publishing cases on this issue and, sometimes discussing *Biljac* and sometimes not, disagreed with its holding, holding instead that a trial judge's failure to rule on the evidentiary objections must be treated as though the objections were impliedly overruled and the evidence thus part of the record for purposes of appellate review.

The first published case to so hold was *Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, 736 [80 Cal.Rptr.2d 454], where, without mention of *Biljac*, the Court of Appeal held that "[t]he trial court's statement that it had considered only admissible evidence was not an implied ruling sustaining unspecified evidentiary objections. On the contrary, *Ann M.* teaches that we must take this statement as an implied overruling of any objection not specifically sustained. Thus we must deem the substance of paragraphs 2 through 4 of Laird's declaration, as to which the trial court did not expressly rule, admissible and may not consider Cap Cities' renewed objections thereto."

*City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780 [97 Cal.Rptr.2d 140] (*City of Long Beach*) came next. There, citing and quoting *Sharon P.* and *Ann M.*, Presiding Justice Turner noted that "[t]ypically, when a trial judge fails to rule on summary judgment or adjudication motion evidentiary objections, the California Supreme Court has held that the objections are deemed waived on appeal." (*Id.* at p. 783.) Then, citing cases beginning in 1872 holding that failure to rule on evidentiary objections deems them waived, he noted that *Sharon P.* and *Ann M.* were "merely the application of the trial rule concerning waiver of . . . objections in the law and motion context." (*City of Long Beach, supra*, 81 Cal.App.4th at p. 784.)

Despite that, Justice Turner went on to note that defense counsel had twice orally requested that the trial court rule on the written objections, yet the court failed to do so. And, he held, where the court neglects to rule on objections despite repeated requests by counsel, there is no waiver and the objections are preserved on appeal. (*City of Long Beach, supra*, 81 Cal.App.4th at pp. 784–785.) The unpublished portion of the opinion went on to affirm the summary judgment, presumably first ruling on the objections to evidence.

The next case was *Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225 [114 Cal.Rptr.2d 151], where the Court of Appeal devoted more than three pages to a discussion on why it disagreed with *Biljac*. (*Id.* at pp. 234–238.) The court explained: "Because it is not the function of an appellate court to make such evidentiary rulings in the first instance, we disagree with the approach set out in *Biljac, supra*, 218 Cal.App.3d 1410 to the extent it fosters the fiction that a trial court's failure to rule on evidentiary

objections means the trial court has considered only admissible evidence. Rather, even in the summary judgment context, 'Trial courts have a duty to rule on evidentiary objections.' [Citation.] When that duty is not performed, appellate courts are left with the nebulous task of determining whether the ruling that was purportedly made was within the authority and discretion of the trial court and was correct." (*Id.* at p. 235, quoting *City of Long Beach, supra*, 81 Cal.App.4th at p. 784.)

*Sambrano* was followed by *Swat-Fame, Inc. v. Goldstein* (2002) 101 Cal.App.4th 613, 623 [124 Cal.Rptr.2d 556] (*Swat-Fame*), disapproved on other grounds in *Zamos v. Stroud* (2004) 32 Cal.4th 958 [12 Cal.Rptr.3d 54, 87 P.3d 802], which described *Biljac* as an "unacceptable circumvention of the court's obligation to rule on the evidentiary objections presented." Citing *Sharon P.* and *Ann M.*, the court agreed that when "the trial judge fails to rule on objections to evidence presented at a summary judgment motion, the objections are deemed waived on appeal." (*Swat-Fame, supra*, 101 Cal.App.4th at p. 623.) The court also recognized the exception set forth in *City of Long Beach, supra*, 81 Cal.App.4th at page 784, that no waiver occurs "when counsel specifically requests a ruling on evidentiary objections and the trial court nonetheless declines to rule." (*Swat-Fame, supra*, 101 Cal.App.4th at p. 624, fn. 7.)

Next was *Vineyard Springs Estates v. Superior Court* (2004) 120 Cal.App.4th 633, 642 [15 Cal.Rptr.3d 587] (*Vineyard*), where, after discussing Code of Civil Procedure section 437c, subdivision (d), and noting that "Section 437c repeatedly points out the trial court's duty to weigh and rule on evidentiary objections," the court observed: "In light of the foregoing statutory requirements, it has been correctly held that, when evidentiary objections are in a proper form, a trial court must rule on the objections. [Citations.] [¶] It is imperative that a trial court rule on evidentiary objections regardless of whether the motion is denied or granted. A trial court cannot decide whether a motion should be denied or granted until it has first determined what admissible evidence is in play on the motion. Moreover, when a trial court fails to rule on summary judgment evidentiary objections, the objections are ordinarily deemed waived on appeal, and the appellate court will consider the objected to evidence in reviewing the ruling on the motion. [Citations.] This is a bitter pill for a party who has tendered valid objections." (120 Cal.App.4th at pp. 642–643.)[5]

---

[5] The *Vineyard* court went on to conclude as follows: "Here, after promising the parties three times that it would rule on the evidentiary objections, the trial court inexplicably failed to do so. The trial court could not rationally evaluate the current motion without first ruling on the evidentiary objections. The trial court failed in its duty. A writ of mandate 'must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law.' [Code Civ. Proc., § 1086.] Vineyard has no plain, speedy, and adequate remedy; it is

Last year saw *Lincoln Fountain Villas Homeowners Assn. v. State Farm Fire & Casualty Ins. Co.* (2006) 136 Cal.App.4th 999, 1010, footnote 4 [39 Cal.Rptr.3d 345] (*Lincoln Fountain*) where the court observed that "[t]he trial court should have, but for some reason did not, rule on [defendant's] objections, one or more of which appear to have been well taken." Citing *Sharon P.* and *Ann M.*, the court then stated that "[a]s a general rule, on appeal from an order granting summary judgment the reviewing court may consider any objected-to evidence in the absence of a ruling in the trial court." (*Lincoln Fountain, supra*, 136 Cal.App.4th at p. 1010, fn. 4.)

And most recent is *Cheviot Vista Homeowners Assn. v. State Farm Fire & Casualty Co.* (2006) 143 Cal.App.4th 1486 [50 Cal.Rptr.3d 1]. There, after noting that, as in *Lincoln Fountain, supra*, 136 Cal.App.4th 999, the trial court failed to rule on the defendant's evidentiary objections, the court stated that "[t]he trial court's assertion it considered only admissible evidence is not an acceptable alternative to a ruling on the objections." (*Cheviot Vista, supra*, at p. 1500, fn. 9, citing *Swat-Fame, supra*, 101 Cal.App.4th 613, and *Sambrano v. City of San Diego, supra*, 94 Cal.App.4th 225.)

We read *Ann M., supra*, 6 Cal.4th 666, and *Sharon P., supra*, 21 Cal.4th 1181, as having impliedly overruled *Biljac* and establishing that trial courts must rule on evidentiary objections in the summary judgment context or the objections will be deemed waived. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Despite this, and perhaps because neither case specifically mentioned that it was overruling *Biljac*, some trial courts are still apparently following the *Biljac* approach, at least if this case is any indication. Therefore, to the extent there remains any ambiguity in the First District as to a trial court's obligation with respect to ruling on evidentiary objections in the summary judgment setting, we hold here that the procedure countenanced in *Biljac* does not meet a trial court's obligation, and that a trial court presented with timely evidentiary objections in proper form must expressly rule on the individual objections, and it if does not, the objections are deemed waived and the objected-to evidence included in the record. This, we conclude, is the holding dictated by *Ann M., supra*, 6 Cal.4th 666, and *Sharon P., supra*, 21 Cal.4th 1181, and one consistent with all published post-*Biljac* Court of Appeal opinions.[6]

---

headed for trial. We will issue a writ commanding the trial court to vacate its order denying summary judgment, to rule on all evidentiary objections, and to reconsider the summary judgment motion in light of its rulings on the evidentiary objections." (*Vineyard, supra*, 120 Cal.App.4th at p. 643.)

[6] We are cognizant of the concerns expressed by the trial court in *Biljac*, that ruling on individual evidentiary objections can be a "horrendous, incredibly time-consuming task . . ." (*Biljac, supra*, 218 Cal.App.3d at p. 1419, fn. 3), an observation that may have been

As discussed above, various courts have recognized exceptions to this general rule of waiver where counsel has expressly requested a ruling on the objections and the trial court has failed to rule. Illustrative is *Vineyard, supra,* 120 Cal.App.4th 633, where the trial court promised the parties three times it would rule on the objections, inexplicably failed to do so, and then denied summary judgment. The Court of Appeal issued a writ commanding the trial court to vacate its order, rule on the evidentiary objections, and reconsider the summary judgment motion. (*Id.* at p. 643.)[7] Likewise *City of Long Beach, supra,* 81 Cal.App.4th 780, which held that the objections are preserved on appeal where the trial court neglects to rule on objections despite repeated requests by counsel. And the logical next question for analysis would be whether the situation here is analogous to, or distinguishable from, the situation in *City of Long Beach*—that is, whether the trial court's statement that it would consider only admissible evidence is the functional equivalent of a refusal to rule, thus preserving the objections on appeal, or rather a failure to rule on the objections, thus waiving them. However, we need not decide this question because we give Demps the benefit of the situation and consider all the evidence in the record as though the objections were waived. Reviewing the record in that light, we conclude that the trial court's grant of summary judgment was correct.

B. *The Summary Judgment Was Correct**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

particularly apt there, an antitrust case. However, such concerns too often present themselves in noncomplex cases as well, seemingly because, however inappropriately, litigants file blunderbuss objections to virtually every item of evidence submitted. This is hardly good advocacy, and it unnecessarily overburdens the trial court. And were counsel to reject this approach, and object instead only to items of evidence that are legitimately in dispute and pertinent to the disposition of the motion, it should ease the burden significantly. In this regard, we note that amended California Rules of Court, rule 3.1354, effective January 1, 2007, requires objections to evidence in support of or in opposition to a motion for summary judgment or summary adjudication to be submitted in a specific format and to be accompanied by a proposed order, which change should facilitate the trial court's task of considering and ruling on objections.

[7] While such a procedure may have been appropriate given the procedural posture there— before the Court of Appeal on a writ following denial of a motion for summary judgment—we question the efficacy of such an approach here, an appeal following a successful defense motion for summary judgment, as it would threaten to cause undue delay in rendering a final determination on summary judgment motions.

*See footnote, *ante,* page 564.

## III. DISPOSITION

For the reasons set forth in the unpublished portions of the opinion, the summary judgment for the Housing Authority and Roetzer is affirmed.

Kline, P. J., and Haerle, J., concurred.